PAMELA JOANN GRESS, APPELLEE AND CROSS-APPELLANT, V.
PATRICK RAYMOND GRESS, APPELLANT AND CROSS-APPELLEE.
743 N.W.2d 67

Filed December 21, 2007.    No. S-06-607.

Louie M. Ligouri, of Ligouri Law Office, for appellant.

Stefanie S. Flodman and Steven J. Flodman, of Johnson, Flodman, Guenzel & Widger, for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

This action originated as a petition for dissolution of marriage between Pamela Joann Gress and Patrick Raymond Gress. The district court dissolved the marriage between the parties, divided their assets, and ordered Patrick to make monthly child and spousal support payments. Patrick appealed, citing an error in the district court's calculation of child support and alimony. On appeal, we concluded the district court improperly calculated child support. We therefore remanded the cause for further

proceedings, instructing the court to recalculate Patrick's share of child support and to make any necessary changes to the alimony award.[1]

On remand, the district court made a slight reduction in Patrick's child support obligation and reinstated its order that Patrick pay alimony of $1,000 per month for 60 months. Patrick now appeals, once again arguing that the district court erred in setting the amount of his child and spousal support obligations. Pamela cross-appeals, contending the district court erred by limiting alimony to a period of 60 months. For reasons developed in detail below, we affirm the district court's child support order and the duration of the alimony award, but reverse the court's order with regard to the amount of alimony.

## II. BACKGROUND

Because a more thorough statement of facts can be found in our prior opinion,[2] we recount only facts relevant to this appeal. During the marriage, Pamela was a stay-at-home mother while Patrick, a lifelong farmer, worked the family's farm. In September 2003, Pamela petitioned for a divorce. Patrick and Pamela have four children ranging in age from 5 to 17. The youngest of the Gress children was born with Down syndrome.

On December 15, 2004, the district court entered an order which dissolved the marriage, divided the couple's assets and liabilities, and ordered Patrick to pay child support and alimony. Specifically, Patrick was ordered to pay, among other things, child support of $1,285 per month and alimony of $1,000 per month for 60 months. As noted above, Patrick appealed to this court, and after identifying an error in the district court's calculation of depreciation in Patrick's income, we remanded the cause for further proceedings, instructing the court to adjust the amount of Patrick's child support responsibilities. On remand, the court reduced Patrick's child support obligation to $1,224 per month and reinstated its order that Patrick pay Pamela alimony of $1,000 per month for 60 months. Patrick was also

---

[1] *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

[2] See *id.*

ordered to pay an "80.5 %" share of any daycare costs. Both parties now appeal.

## III. ASSIGNMENTS OF ERROR

Patrick assigns, restated and renumbered, that the district court erred in calculating Patrick's child support obligation by (1) basing the calculation on an average of his incomes from 2001 through 2003, (2) disregarding paragraph Q of the Nebraska Child Support Guidelines, (3) violating paragraph R of the Nebraska Child Support Guidelines, and (4) failing to take the youngest child's Social Security benefits into consideration. Additionally, Patrick assigns that the district court erred in (5) awarding an unreasonable amount of alimony to Pamela.

In her cross-appeal, Pamela assigns that the district court erred by limiting Patrick's alimony obligation to 60 months.

## IV. STANDARD OF REVIEW

■ Domestic matters such as child custody, division of property, child support, and alimony are entrusted to the discretion of trial courts.[3] A trial court's determinations on such issues are reviewed "de novo on the record to determine whether there has been an abuse of discretion by the trial judge."[4] Under this standard, an appellate court conducts its "own appraisal of the record" to determine whether the trial court's judgments "are untenable such as to have denied justice."[5]

■ Finally, we note that interpretation of the Nebraska Child Support Guidelines presents a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[6]

## V. ANALYSIS

■ Taken together, the parties' assignments of error concern either the amount of Patrick's child support obligation or the

---

[3] See *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

[4] *Gress, supra* note 1, 271 Neb. at 124, 710 N.W.2d at 323. See, also, *Robb, supra* note 3.

[5] *Guggenmos v. Guggenmos*, 218 Neb. 746, 748, 359 N.W.2d 87, 90 (1984).

[6] *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001).

amount and duration of Patrick's spousal support obligation. The Nebraska Child Support Guidelines (hereinafter NCSG) instruct that a party's alimony obligation is to be set according to the income he or she has available *after* his or her child support obligations, if any, have been accounted for.[7] Accordingly, we begin with an analysis of the district court's child support determination, then the alimony award.

## 1. Child Support

Patrick argues that the trial court erred in ordering him to pay $1,224 per month in child support. He offers four distinct reasons why this figure is erroneous. First, Patrick argues that the court erred in averaging his incomes from 2001 through 2003. Patrick contends the court should have used an 8-year average instead or, at the very least, should have included Patrick's income from 2004 in its average. Second, Patrick argues that the district court erred by disregarding paragraph Q of the NCSG in setting child support. Third, Patrick argues that the district court erred by ordering an amount of child support which allegedly violates paragraph R of the NCSG. Finally, Patrick argues that the district court incorrectly ignored the Social Security allowance in setting Patrick's child support obligation. We address each argument in turn in the sections that follow.

### (a) Income Averaging

In his primary argument, Patrick asserts that the district court erred in averaging his annual income for the purpose of calculating his monthly child support obligation. Before determining an individual's child support obligation, the trial court must identify the monthly incomes for both the custodial and noncustodial parents.[8] As a self-employed farmer, Patrick's income is prone to fluctuations from year to year. The NCSG anticipates this contingency and provides that "[i]n the event of substantial fluctuations of annual earnings of either party during

---

[7] Nebraska Child Support Guidelines, paragraph M. See, also, *Gress, supra* note 1.

[8] See *Gress, supra* note 1 (citing *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004)).

the immediate past 3 years, the income may be averaged to determine the percent of contribution of each parent . . . ."[9]

In 2001, Patrick's annual income was $51,654. In 2002, this figure increased to $61,059, only to plummet to $28,400 in 2003. These figures translate to an approximate 18-percent increase from 2001 to 2002, then a 54-percent drop from 2002 to 2003. This is the sort of substantial fluctuation that the NCSG contemplates. Therefore, it was entirely proper for the district court to use income averaging to calculate Patrick's income for child support purposes. Patrick contends, however, that the district court erred by (1) using a 3-year average instead of an 8-year average or, alternatively, (2) not including Patrick's income from 2004 in its average.

*(i) 8-Year Average*

Per Pamela's suggestion, the district court averaged Patrick's annual income from 2001 through 2003 to identify Patrick's income for child support purposes. Averaging these figures gave Patrick an estimated gross income of $47,037 per year, or $3,920 per month. Patrick argues that the court should have used an 8-year average rather than a 3-year average to estimate his income. Using the figures Patrick supplies in his brief for the additional 5 years, an 8-year average would result in an income of $34,065 per year, or $2,839 per month.

In support of his claim that the court should have used an 8-year average, Patrick cites testimony by his tax preparer, Gerald Siefken, a farm tax expert. Siefken testified that farmers' incomes are inherently unpredictable and that it was his practice to use an 8- or 10-year average to calculate farmers' taxes. Patrick emphasizes that his incomes from 2001 and 2002 are some of the highest incomes he has had in recent history. Patrick argues that using those 2 years as two-thirds of the average misrepresents his actual level of income. Relying on Siefken's testimony, Patrick suggests that only an 8-year average will accurately reflect his present level of income. The question, then, is whether the district court abused its discretion by using a 3-year average instead of an 8-year average.

---

[9] Nebraska Child Support Guidelines, worksheet 1 (fourth footnote).

We have not yet had occasion to consider the number of years a court should—or must—use when averaging an income pursuant to the NCSG. As stated above, the NCSG provides that in the event of a fluctuation within "the immediate past 3 years, the income may be averaged."[10] This language could be read as indicating that a fluctuation within the prior 3 years should trigger an average of the incomes only from those prior 3 years. On the other hand, it is entirely possible to read this language as standing for the proposition that a fluctuation in the prior 3 years triggers some form of averaging, be it 3 years, 8 years, or some other number.

This was apparently the reading the Nebraska Court of Appeals adopted in *Wagoner v. Tracy*.[11] In *Wagoner*, the court acknowledged that the NCSG "refer[s] to a 3-year average," but nonetheless permitted a 5-year average.[12] The court reasoned that such an average "result[ed] in a more fair representation of [the husband's] income" than a 3-year average.[13] Similarly, the Court of Appeals had allowed a 4-year average in *Hughes v. Hughes*.[14]

Although we previously discussed income averaging in *Peter v. Peter*,[15] that case dealt solely with the threshold question of when averaging is appropriate and did not describe how to actually conduct the average. It is perhaps worth noting, however, that the average at issue in *Peter* was a 3-year average.[16] In fact, *Wagoner* and *Hughes* aside, it appears that income averaging is almost always discussed with reference to a 3-year average in Nebraska.[17]

---

[10] *Id.*

[11] *Wagoner v. Tracy*, No. A-05-301, 2006 WL 3487649 (Neb. App. Dec. 5, 2006) (not designated for permanent publication).

[12] *Id.* at *7.

[13] *Id.*

[14] *Hughes v. Hughes*, 14 Neb. App. 229, 706 N.W.2d 569 (2005).

[15] *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

[16] *Id.*

[17] See, e.g., *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003); *Willcock v. Willcock*, 12 Neb. App. 422, 675 N.W.2d 721 (2004); *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003).

A survey of decisions from other jurisdictions reveals a similar pattern. Indiana's child support guidelines expressly recommend a 2- or 3-year average.[18] A number of other courts use 3- or 4-year averages when calculating an obligor's income for child support purposes.[19] It seems that only a few states go as high as a 5-year average. North Dakota expressly allows up to a 5-year average by law,[20] and courts in Iowa and Minnesota have used 5-year averages.[21]

The Iowa Supreme Court's willingness to use a 5-year average is particularly relevant. Similar to Patrick's arguments in this case, a farmer argued before the Iowa Supreme Court that he deserved a 5-year average of his income for child support purposes due to fluctuations inherent in farming incomes. The court agreed.[22] Not all courts go beyond 3 years when faced with highly unpredictable forms of self-employment, however. For example, in *In re Marriage of Nelson*,[23] the Illinois Court of Appeals used a 3-year average for a farmer. Similarly, in *Zimin v. Zimin*,[24] an Alaskan fisherman insisted that only a 10-year average could fairly assess his highly unpredictable income for child support purposes. The Alaska Supreme Court disagreed, concluding that a "three-year average . . . provide[s] an accurate estimate of a parent's current earning capacity when a parent's income is subject to yearly fluctuations."[25]

---

[18] See *Lloyd v. Lloyd*, 755 N.E.2d 1165 (Ind. App. 2001).

[19] See, e.g., *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 785 N.E.2d 172, 271 Ill. Dec. 521 (2003) (3-year average); *Roberts v. Roberts*, 924 So. 2d 550 (Miss. App. 2005) (same); *Alexander v. Alexander*, 34 S.W.3d 456 (Tenn. App. 2000) (4-year average); *Fleenor v. Fleenor*, 992 P.2d 1065 (Wyo. 1999) (3-year average).

[20] N.D. Admin. Code 75-02-04.1-05 (2003).

[21] See, *In re Marriage of Robbins*, 510 N.W.2d 844 (Iowa 1994); *Tipler v. Edson*, No. A05-1518, 2006 WL 1390439 (Minn. App. May 23, 2006) (unpublished opinion).

[22] *In re Marriage of Robbins, supra* note 21.

[23] *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 698 N.E.2d 1084, 232 Ill. Dec. 654 (1998).

[24] *Zimin v. Zimin*, 837 P.2d 118 (Alaska 1992).

[25] *Id.* at 123 n.9.

The foregoing compels several conclusions. First, it appears that both here and elsewhere, a 3-year average tends to be the most common approach in cases where a parent's income tends to fluctuate. Second, even among the jurisdictions which permit an average of more than 3 years, courts appear reluctant to use more than a 5-year average. Therefore, even assuming that income averaging under the NCSG is not limited to a 3-year average, the authority from both Nebraska and elsewhere suggests that the district court did not abuse its discretion by declining to use an 8-year average.

It is theoretically possible that the district court could have reached a more accurate assessment of Patrick's current earning capacity by including additional years in its average. However, we believe that the use of a 3-year average in this instance is not so "clearly untenable" that it "unfairly deprives [Patrick] of a substantial right" or denies him "a just result."[26]

#### (ii) Annual Income From 2004

Patrick next argues that the district court erred in failing to include his income from 2004 either in addition to the 3 years the district court selected for its average or as a replacement for one of those years.

■ As a general matter, in the determination of child support, income from a self-employed individual is determined by looking to that person's tax returns.[27] At trial, tax returns showing Patrick's incomes for 2001 through 2003 were offered and admitted into evidence. It appears that a tax return for 2004 was never offered. This is not surprising, given that the trial was held during 2004.

In addition, we recognize that a party undergoing a divorce may have both the motive and the opportunity to underreport his or her own income.[28] Indeed, Siefken, Patrick's tax preparer, testified that a farmer can easily, and legally, manipulate his or

---

[26] See State v. Anglemyer, 269 Neb. 237, 242, 691 N.W.2d 153, 159 (2005).

[27] See, Rhoades v. Rhoades, 258 Neb. 721, 605 N.W.2d 454 (2000) (citing Marr v. Marr, 245 Neb. 655, 515 N.W.2d 118 (1994), and Nebraska Child Support Guidelines, paragraph D).

[28] See Ferguson v. Ferguson, 357 N.W.2d 104 (Minn. App. 1984).

her income simply by harvesting crops and storing them until the following year. As it turns out, Patrick had unsold grain in his possession while the divorce was pending.

All of the above is not to suggest that Patrick himself has engaged in any intentional efforts to underreport his income. The point is that even if Patrick had supplied information about his income for 2004, the district court had ample justification to view such information with skepticism. Accordingly, the district court did not abuse its discretion by excluding 2004 from its average of Patrick's income.

### (b) Paragraph Q

Patrick next argues that the district court erred when it failed to consider paragraph Q of the NCSG. Paragraph Q provides the following:

> Modification. Application of the child support guidelines which would result in a variation by 10 percent or more, but not less than $25, upward or downward, of the current child support obligation, child care obligation, or health care obligation, due to financial circumstances which have lasted 3 months and can reasonably be expected to last for an additional 6 months, establishes a rebuttable presumption of a material change of circumstances.

Patrick quotes a portion of this language in his brief, but fails to explain what difference it makes in his legal position. This likely stems from the fact that paragraph Q is unrelated to the present case.

Under Nebraska law, a party can modify a prior child support order by showing there has been a material change in circumstances since the court's prior order.[29] Restated, paragraph Q explains that a material change is presumed if a parent's recalculated child support obligation—using current financial information—would result in a deviation of at least 10 percent over the parent's old obligation, provided the current financial information has been accurate for the prior 3 months and will stay accurate for the next 6 months. As construed by the Court of Appeals, a party who seeks to have a prior child

---

[29] See *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999).

support order modified can prove that a modification is warranted simply by a showing of the conditions described in paragraph Q.[30]

We do not see, and Patrick fails to explain, how the presumption created by paragraph Q is relevant. First, this case did not originate as a petition to modify a prior child support order; it is actually the district court's attempt to establish an initial child support order. Second, and relatedly, neither party contends that there has been a material change in circumstances. Accordingly, we see no merit in Patrick's assignment of error involving paragraph Q.

### (c) Paragraph R

Patrick next argues the district court erred by ordering a child support obligation which pushes his income below the poverty line. If true, it would contravene paragraph R of the NCSG. In its current form, paragraph R states:

> Basic Subsistence Limitation. A parent's support, child care, and health care obligation shall not reduce his or her net income below the minimum of $851 net monthly for one person, or the poverty guidelines updated annually in the Federal Register by the U.S. Department of Health and Human Services under authority of 42 U.S.C. § 9902(2), except minimum support may be ordered as defined in paragraph I above.

This language makes clear that any child support obligation which reduces a parent's net monthly income below $851—the basic subsistence limitation—violates the NCSG, except that a parent may be ordered to pay the greater of $50 or 10 percent of his or her net income per month.

As a general matter, child support obligations should be set according to the provisions of the NCSG.[31] A court may deviate from the guidelines, but only if it specifically finds that a deviation is warranted based on the evidence.[32] Absent a clearly articulated justification, any deviation from the NCSG is

---

[30] See *Sneckenberg v. Sneckenberg*, 9 Neb. App. 609, 616 N.W.2d 68 (2000).

[31] See *Sears v. Larson*, 259 Neb. 760, 612 N.W.2d 474 (2000).

[32] See *id.*

an abuse of discretion.[33] The district court never indicated that a deviation from paragraph R was warranted. Therefore, the court abused its discretion if its child support order drives Patrick's income below the poverty line set forth in paragraph R.

Based on the income figures supplied for 2001 through 2003, the district court found Patrick's current gross income was $47,037 per year, or $3,920 per month. After taxes, this leaves Patrick with a net monthly income of $2,657.85. From this amount, Patrick was ordered to pay $1,224 per month in child support. That leaves Patrick with $1,433.85 per month, an amount well above the current poverty line.

This is not the end of the inquiry, however, because the district court burdened Patrick with other potential child support obligations in addition to his monthly support payments. Pursuant to paragraph O of the NCSG, Patrick was ordered to pay "80.5 %" of any daycare costs for the children. This daycare obligation is also subject to paragraph R's basic subsistence limitation.[34]

At the outset, we note our suspicion that the district court meant to order Patrick to pay *79.75* percent of future child support costs, rather than 80.5 percent. Our belief is predicated on the fact that 80.5 percent is roughly the amount of child support Patrick was responsible for under the district court's original order that we reversed on appeal. Pursuant to our remand, Patrick's recalculated child support responsibility is 79.75 percent. As a result, we believe the district court intended to require Patrick to pay 79.75 percent, not 80.5 percent, of any daycare costs.

Regardless of the precise proportion, there is nothing in the record to help identify what these costs will be in actual dollars. Although it is certainly possible that paying his share of daycare will reduce Patrick's income below the poverty line, the lack of concrete numbers makes it difficult, if not impossible, to

---

[33] See *Gress, supra* note 1. See, also, *In re Marriage of Mellott*, 32 Kan. App. 2d 1031, 93 P.3d 1219 (2004).

[34] Nebraska Child Support Guidelines, paragraph R. See, also, *Henke v. Guerrero*, 13 Neb. App. 337, 692 N.W.2d 762 (2005) (citing *Kearney v. Kearney*, 11 Neb. App. 88, 644 N.W.2d 171 (2002)).

say for sure. The speculative nature of Patrick's daycare obligations renders it unnecessary for us to comment on whether the court's order violates paragraph R.

We have previously held that a "court's findings regarding [an individual's] level of income should not be based on the inclusion of income that is entirely speculative in nature."[35] This principle works equally well in reverse, such that a court's findings regarding the propriety of child support obligations should not be based on costs that are entirely speculative. In the absence of concrete facts, we decline to consider at this juncture whether Patrick's obligation to pay a sizable portion of his children's daycare costs violates paragraph R.

Of course, our decision does not mean that Patrick must suffer daycare costs that exceed his earning capacity. This is because "changes in the financial position of the parent obligated to pay support" often warrant a modification of the support order.[36] Ordinarily, such changes arise when the obligor's income is increased or decreased substantially. Obviously, increased financial obligations, like decreased income, also qualify as a change in one's financial position. As a result, if Patrick is ever forced to pay for daycare and his income is reduced below the poverty line as a result, Patrick may seek a modification of the court's child support order. But until the daycare costs materialize, Patrick's claim that such expenses will drive his income below the poverty line is too speculative to adjudicate.

Patrick advances another paragraph R argument with regard to his duty to pay 80.5 percent of the children's medical, opthalmological, and orthodontic/dental care costs which are not covered by insurance and exceed $480 per year. As with daycare costs, such health care costs are also subject to paragraph R.[37]

In responding to Patrick's argument, we first note that Patrick's medical care obligation was mentioned only in the district court's original order of December 15, 2004. The

---

[35] *Stuczynski v. Stuczynski*, 238 Neb. 368, 374, 471 N.W.2d 122, 126 (1991).

[36] *Rauch, supra* note 29, 256 Neb. at 261, 590 N.W.2d at 174.

[37] See, Nebraska Child Support Guidelines, paragraph R; *Kearney, supra* note 34.

court's subsequent order, issued in response to our remand, mysteriously lacks any such obligation. Further, the new order expressly states that the December 15 order is to remain in full effect "except for child support and alimony as redetermined herein." In our view, this means Patrick is not obligated to pay a proportional share of the children's health care costs, a result we believe may have been accidental. Nevertheless, we conclude that even if Patrick was obligated to pay for such health care costs, these costs, like the costs for daycare, are entirely speculative. It is therefore inappropriate for this court to determine whether the imposition of such costs would violate paragraph R at this time.

In sum, Patrick's monthly child support responsibility of $1,224 does not, by itself, violate paragraph R of the NCSG. Patrick's additional obligations—daycare and, potentially, health care—may drive his income below the poverty line. Because the costs associated with those obligations are speculative at this point, we hold that the district court's child support order was not an abuse of discretion.

### (d) Social Security Benefits

Patrick next argues the district court erred in disregarding Social Security benefits paid on behalf of the youngest of the Gress children when calculating Patrick's child support obligation. To refresh, the youngest of the Gress children was born with Down syndrome. As a result, the child receives $564 per month in Social Security benefits from the federal government. Citing the Nebraska Court of Appeals' opinion in *Ward v. Ward*,[38] Patrick argues that his child support obligation should be reduced in light of the Social Security benefits.

In *Ward*, a child began receiving Social Security benefits after her adoptive mother passed away. The child's adoptive father remarried, and his second wife also adopted the child. At issue in *Ward* was whether the child's Social Security benefits should offset some of the money each parent owed in child support. The Court of Appeals held that it should offset child support, and it reduced the amount of each parent's obligation by a

[38] *Ward v. Ward*, 7 Neb. App. 821, 585 N.W.2d 551 (1998).

proportion of the Social Security payment equal to that parent's share of the child support needs.[39]

Patrick's suggestion that the same be done in this case would substantially reduce his obligation. The district court found the total support obligation of the Gress children to be $1,535 per month. Patrick, based on his income, is responsible for 79.75 percent of that sum, or $1,224. If the $564 in Social Security benefits is taken into account, the total support obligation for the Gress children would be reduced from $1,535 to $971. Patrick's 79.75-percent share would be $774.

In response to Patrick's request that we apply *Ward* to these facts, Pamela urges us to overrule that decision. We choose neither option. Instead, we hold that whatever merit *Ward* may have in other contexts, the case is not applicable here. For one, we note that *Ward* involved a single child. It seems far less appropriate to offset support obligations for *four* children in light of one child's Social Security benefits.

Second, and more important, it is well established that children with actual disabilities like Down syndrome have special needs above and beyond the needs of most children.[40] All children have support needs, but special-needs children require additional financial support to overcome developmental, cognitive, or physiological problems. With this in mind, the federal government provides Social Security to such children with the intent that it will "supplement other income, not substitute for it."[41] In contrast, the money allocated to the youngest child under the NCSG is meant to provide for the basic needs all children have. To construe one source of money as satisfying both needs would leave either his basic or his special needs unfulfilled.

*Ward*, in contrast, did not present such a situation. Unlike a child with a disability, a child who loses a parent at a young age does not necessarily have special needs that will lead to increased support costs. In that context, Social Security benefits

---

[39] *Id.*

[40] H.R. Rep. No. 92-231 (1971), 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 4989.

[41] *Kyle v. Kyle*, 582 N.E.2d 842, 846 (Ind. App. 1991).

are intended to account for the fact that the child has lost a source of support for his or her basic needs. Using Social Security benefits to offset a portion of child support costs is not necessarily a problem under the circumstances presented by *Ward*. However, it is not appropriate to offset child support costs where, as here, the Social Security benefits are intended to mitigate the additional costs that accompany disabilities. As a result, the district court did not abuse its discretion when it disregarded the Social Security benefits.

## 2. ALIMONY

The remaining assignments of error concern the propriety of the district court's order that Patrick pay Pamela alimony of $1,000 per month for 60 months. Patrick questions the reasonableness of the amount, while Pamela agrees with the amount but argues that alimony should continue beyond 60 months.

### (a) Amount

In his final assignment of error, Patrick contends the district court erred in awarding Pamela an unreasonable amount of alimony. His primary contention is that the alimony amount is unreasonable because paying alimony and child support would drive his income below the basic subsistence limitation expressed in paragraph R of the NCSG. Alternatively, Patrick argues that the district court's award is unreasonable under the circumstances.

Ordinarily, the test for the propriety of an alimony award is whether it is reasonable in light of the parties' circumstances.[42] Patrick suggests that the amount of an alimony award should be regarded as presumptively unreasonable if it would drive a party's income below the poverty line. We agree.

Although paragraph R of the NCSG speaks only to child support, we are persuaded that the basic subsistence limitation in that paragraph should apply with equal force in the alimony context. As a purely logical matter, this conclusion is buttressed by the structure of the NCGS itself. As noted above, paragraph M of the NCSG mandates that alimony be drawn from whatever

---

[42] Neb. Rev. Stat. § 42-365 (Reissue 2004).

income is left *after* child support obligations have been determined.[43] Prioritizing child support over alimony indicates that of the two, child support is the more important support interest. So if child support cannot drive an obligor's income below the poverty line unless specifically warranted,[44] then a fortiori, alimony should also not be allowed to drive an obligor's income below the poverty line unless specifically warranted.

The idea that an alimony award may be regarded as unreasonably high if it impoverishes the obligor spouse finds some support from courts outside Nebraska.[45] Moreover, West Virginia has a statute discouraging alimony awards which, when combined with child support and other similar obligations, drive a party's income below the federal poverty line.[46] We read these authorities as providing some support for our conclusion that an alimony award which drives the obligor's income below the basic subsistence limitation set forth in paragraph R of the NCSG is an abuse of judicial discretion unless the court specifically finds that such an award is warranted based on the evidence.

To be clear, our holding on alimony should be read as a mirror of our holding on child support under paragraph R. As such, we believe an alimony award which drives an obligor's net income below the basic subsistence limitation of paragraph R is presumptively an abuse of judicial discretion unless the court specifically finds that conformity with paragraph R would work an "unjust or inappropriate" result in that particular case.[47]

Of course, the parallel between child support and alimony awards means that an obligor's "income" available for alimony purposes is not necessarily synonymous with taxable income.[48] As such, a deviation from the limitation in paragraph R may

---

[43] Nebraska Child Support Guidelines, paragraph M.

[44] *Sears, supra* note 31.

[45] See, e.g., *Moore v. Moore*, 242 Mich. App. 652, 619 N.W.2d 723 (2000) (per curiam); *Quick v. Quick*, 305 N.C. 446, 290 S.E.2d 653 (1982).

[46] W. Va. Code Ann. § 48-13-702(b)(8) (LexisNexis 2004).

[47] Nebraska Child Support Guidelines, paragraph C(5).

[48] *Gress, supra* note 1.

be warranted in cases where the obligor spouse's gross income could support the court's preferred alimony award even if his or her taxable income would not. In sum, if the combination of child support and alimony obligations would reduce an obligor's *net* income below the basic subsistence limitation in paragraph R, the trial court must make specific findings of fact that the obligor is capable of paying that amount despite his reported income on tax returns. If such findings are made, the court may award alimony in excess of what would otherwise be allowed under the limit in paragraph R. This, of course, is but one example of a way in which the application of paragraph R's limitation may be inappropriate in a particular case.

After accounting for his monthly child support obligation, Patrick is left with a net income of $1,433.85 per month. The district court's alimony award of $1,000 per month leaves Patrick with a net income of $433.85. This figure is $417.15 below the current poverty line in paragraph R. The district court's order, however, lacks a specific explanation of why an alimony award that goes beyond the limit set in paragraph R is warranted. Therefore, under our holding today, the district court's alimony award would appear to be an abuse of discretion.

Of course, the district court could not have anticipated our decision. As such, the lack of a specific declaration that an alimony award of $1,000 is warranted despite its conflict with the limit in paragraph R does not necessarily mean it is not warranted. It may simply mean that the district court did not make such a finding express because, at the time of its order, it was not necessary to do so. Accordingly, we think it prudent to remand this cause back to the trial court so that it may have the opportunity to determine whether an alimony award beyond the limit set forth in paragraph R is warranted. If not, the district court should award Pamela no more than $582.85 per month in alimony.

Because the district court may have abused its discretion by ordering an alimony award that contravenes the basic subsistence limitation of paragraph R, we need not address Patrick's alternative argument that the alimony award is unreasonable under the circumstances.

### (b) Duration

In her cross-appeal, Pamela argues that the district court erred in terminating her alimony award after 60 months. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support.[49] Above all else, the duration of an alimony award must be reasonable in light of this purpose.[50]

It would be difficult to say on this record, however, that the district court abused its discretion when it concluded that Pamela will be able to secure sufficient employment after 5 years. Although Pamela disputes that conclusion, she fails to articulate any reason why it is false.

Indeed, in the section of her brief dedicated to a discussion of the alimony award's duration, Pamela merely advances arguments concerning the *amount* of alimony. Pamela never points to evidence in the record which supports the idea that 5 years will not provide sufficient time for her to establish gainful employment. As a result, Pamela has failed to carry her burden to show that limiting alimony to a period of 5 years was an abuse of the district court's discretion.

### VI. CONCLUSION

We conclude that the district court did not abuse its discretion in ordering Patrick to pay $1,224 per month in child support. Specifically, it was not an abuse of discretion to use a 3-year average to calculate Patrick's income for child support purposes. Moreover, the district court did not abuse its discretion when it excluded Patrick's income from 2004 in its income average. Although Patrick's additional child support obligations may eventually cause his income to drop below the poverty line of paragraph R, we cannot say that such obligations violate that provision at this juncture. Finally, it was not an abuse of discretion to disregard the youngest child's Social Security benefits when calculating Patrick's child support obligation.

With regard to the court's alimony award, the district court did not abuse its discretion when it limited Pamela's alimony

---

[49] *Kimbrough v. Kimbrough*, 228 Neb. 358, 422 N.W.2d 556 (1988).

[50] See *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002).

award to a period of 60 months. It appears, however, that it was a potential abuse of discretion to order Patrick to pay alimony which will drive his net income below the current basic subsistence limitation set forth in paragraph R of the NCSG. To resolve that potential, we remand the cause back to the trial court so that it may determine whether such an alimony award is specifically warranted by the evidence.

As a result, we reverse the district court's alimony award and remand the cause with directions to enter a monthly alimony award of $582.85 per month for 60 months unless the evidence warrants an upward deviation. On remand, the district court should also clarify (1) whether Patrick's actual share of daycare is 79.75 percent or 80.5 percent and (2) whether Patrick is accountable for the same proportion—79.75 percent—of the children's health care costs not covered by insurance and which exceed $480.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.