See, also, *State v. Shelby*, 194 Neb. 445, 232 N.W.2d 23 (1975) (affirming resentencing where defendant was invalidly sentenced to treatment or confinement in Lincoln Regional Center under discretion of director).

Because no valid sentence was initially imposed upon Minnick, the court had the authority to bring Minnick back into the courtroom and impose a valid complete sentence, even if it increased the term of imprisonment.

## CONCLUSION

Because the original sentence was unauthorized and therefore void, the district court did not err in imposing a new sentence on Minnick. Accordingly, we affirm the conviction and sentence.

Affirmed.

––––––––––––––––

State of Nebraska on behalf of Andrew D.,
a child under 18 years of age, appellee,
v. Bryan B., defendant and third-party
plaintiff, appellant, and Monica D.,
third-party defendant, appellee.

___ N.W.2d ___

Filed May 26, 2015.    No. A-14-225.

1. **Actions: Paternity: Child Support: Equity.** While a paternity action is one at law, the award of child support in such an action is equitable in nature.
2. **Paternity: Child Support: Appeal and Error.** A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.
3. **Child Support: Rules of the Supreme Court: Insurance: Proof.** The Nebraska Child Support Guidelines provide that the increased cost to the parent for health insurance for the children shall be prorated between the parents. The parent paying the premium receives a credit against his or her share of the monthly support, provided that the parent requesting the credit submits proof of the cost of health insurance coverage for the children.
4. **Child Support.** As a general matter, parties' current earnings are to be used in calculating child support.
5. ____. If there is substantial fluctuation in income from year to year, the trial court may use income averaging to calculate income for child support purposes.

Appeal from the District Court for Douglas County: Gregory M. Schatz, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

Grant A. Forsberg, of Forsberg Law, P.C., L.L.O., for appellant.

Julie Fowler, of Child Support Enforcement Office, for appellee State of Nebraska.

Michael B. Lustgarten, Britt H. Dudzinski, and A. Jill Stigge, Senior Certified Law Student, of Lustgarten & Roberts, P.C., L.L.O., for appellee Monica D.

Moore, Chief Judge, and Inbody and Pirtle, Judges.

Pirtle, Judge.

## INTRODUCTION

Bryan B. appeals from an order of the district court for Douglas County determining custody and child support for his minor child, Andrew D. Bryan challenges the court's child support calculation, taking issue with the health insurance deduction given to the child's mother, Monica D., and the income figures used for both parties. He also challenges a provision in the order requiring him to submit to random drug tests at Monica's request. Based on the reasons that follow, we affirm in part as modified, and in part reverse and remand with directions.

## BACKGROUND

Bryan and Monica are the biological parents of Andrew, born in 2011. In November 2012, the State on behalf of Andrew filed a complaint to establish paternity and support. Both Bryan and Monica filed an answer and cross-claim.

In May 2013, Monica filed a motion asking the court to enter an order requiring Bryan to submit to hair follicle drug testing. Monica alleged that Bryan had initially voluntarily agreed to comply with such testing, but later refused after such testing was set up and paid for. The motion also requested temporary orders regarding physical and legal custody, visitation,

child support, daycare expenses, health insurance coverage for Andrew, and attorney fees.

The court entered a temporary order in June 2013, awarding Monica temporary sole legal and physical custody, ordering Bryan to pay child support and 50 percent of daycare expenses, ordering Monica to provide health insurance for Andrew if available through her employer, and ordering Bryan to submit to a hair follicle drug test or a urinalysis within 24 hours of Monica's request at a facility of her choice.

Bryan submitted to a drug test in June 2013, the results of which were negative for drugs, and another test in October 2013, the results of which were positive for marijuana.

Trial was held on the complaint to establish paternity and support in December 2013. The evidence showed that Bryan is a self-employed mechanic and owns an automobile repair business. Bryan admitted that he has failed to file personal and business income tax returns since he started his business in 2008, stating that he is a "poor paper manager." Accordingly, there were no income tax returns presented to the court to use in determining Bryan's income for child support purposes.

Bryan testified that after paying the bills of his business, he makes about $2,000 per month in income. He also presented exhibit 7, an estimated income statement for his business for the years 2012 and 2013. The exhibit showed a net income of $14,727.60 for 2012, a net income of $18,333.60 for 2013, and monthly net income of $1,527.80. Brian presented a second exhibit, exhibit 8, which showed his monthly deposits and withdrawals from December 2011 through November 2013 for his business checking account. Between December 2011 and December 2012, his monthly deposit average was $17,856.89 and his monthly withdrawal average was $17,399.37. Between January 2013 and November 2013, his monthly deposit average was $20,572.30 and his monthly withdrawal average was $20,698.67. Bryan further presented exhibit 6, an estimated income statement for the building where his business is located, which building he owns. It showed a net loss of $34,989.88 for 2013, as well

as a monthly net loss of $2,915.82. Monica objected to the admission of all three exhibits, and the court overruled the objection, stating it would give the exhibits the value the court believed they deserved.

Bryan testified that he leases part of the building where his business is located. He also has some storage units on the property that he rents out. Bryan also owns a two-unit building with his parents that they rent out. Bryan testified that he nets about $100 per month from the building. Bryan testified that he also owns a "double-wide modular, or trailer house," that he was in the process of renovating at the time of trial. He hoped to rent it out after the construction was done. He also owns a piece of unimproved real estate with his brother.

Bryan testified that between his business and his rental property, $2,500 was a reasonable amount of monthly income to use for him in the child support calculation.

Bryan testified that he uses a computer program named "QuickBooks" for his business. Prior to trial, Bryan provided Monica's counsel with a copy of the QuickBooks records for his business. On cross-examination, Monica's counsel presented Bryan with exhibit 3, a balance sheet dated December 3, 2013, for Bryan's business, printed from the QuickBooks records Bryan provided Monica. It showed $602,995.75 in total assets, $20,080.94 in total liabilities, and $582,914.81 in total equity. Bryan contended that the balance sheet was not accurate because it did not reflect the expenses and liabilities of the business, only income. Bryan testified that he does not record expenses in QuickBooks and that he only uses it for estimates and receipts. Bryan's counsel objected to the admission of the exhibit into evidence, and the trial court overruled the objection.

Monica testified about her work history for the past several years before trial. She testified that in 2010, she worked for a company where she made $171,682. She left her employment with that company and was unemployed for a time, then worked for another company, where her salary was $50,000 per year. Monica testified that she left that company to work as an independent contractor for a business where she was

earning $6,200 per month, or $74,000 per year. The day before trial, Monica began working as an independent contractor for a different business and was going to make $6,000 per month, or $72,000 per year. Her contract was for 3 months, and after that time, her position and salary were to be reevaluated. Monica's tax returns for the years 2010, 2011, and 2012 were entered into evidence. The tax returns showed that in 2010, she earned $171,682; in 2011, she earned $124,856; and in 2012, she earned $39,553.

Monica also testified that Andrew was not covered by health insurance at the time of trial, but that she intended to seek private health insurance coverage for him. She testified that she had investigated the cost of a "catastrophic-only health insurance policy" and that the cost would be about $250 per month.

There was also testimony from both parties regarding Bryan's past marijuana use. Monica testified that in the 4 years that she and Bryan were together, Bryan would smoke marijuana daily. She testified that after their relationship ended in 2012, Bryan told her he was trying to quit smoking marijuana, but he admitted that during their relationship, he bought marijuana on a weekly basis and had been spending $400 per month. Monica testified that she was asking the court to include in the paternity order a similar drug test provision to that included in the temporary order. She indicated that Bryan had agreed to the provision in the temporary order requiring him to submit to a hair follicle drug test or a urinalysis at her instruction. She testified that her request to have a similar provision included in the paternity order was based on the fact that Bryan tested positive for marijuana in October 2013. She further testified that the provision she was requesting was modified somewhat from that in the temporary order. Monica stated that the provision could limit the number of tests to no more than four per year and that it could state if the drug tests are clean for 1 year, the testing requirement would end.

Bryan testified that he had not smoked marijuana at all since June 2013 and that the positive test in October must have been

due to marijuana use from June or earlier. He testified that prior to June 2013, he smoked marijuana every few weeks. He denied smoking marijuana daily and denied spending $400 per month as Monica claimed. He also testified that he has never smoked marijuana around Andrew.

When asked whether he agreed to the drug testing provision in the temporary order, Bryan indicated that he did, but only because his attorney told him that he did not have a choice. Bryan testified that he did not want the drug testing provision in the paternity order because he objects to the hair follicle drug test being a method of testing. Bryan testified that he told Monica he would take a urinalysis.

A certified professional collector for a drug testing company testified that she performed the collection of Bryan's hair specimen for the October 2013 drug test and sent it to a laboratory where the hair sample was tested to determine if Bryan had used drugs. After the testing was conducted, the laboratory notified the collector of the results, which were positive for "THC metabolite," or marijuana. She further explained the positive test results indicated that Bryan had smoked marijuana at some point in the past 90 days before the sample was taken, but the results do not indicate how often Bryan had smoked marijuana in the past 90 days.

The trial court entered an order on February 11, 2014, finding that Bryan and Monica were the biological parents of Andrew, awarding Bryan and Monica joint legal custody, and awarding Monica sole physical custody of Andrew subject to Bryan's parenting time. Bryan was ordered to pay child support in the amount of $470 per month, which the court determined by using $3,500 per month for Bryan's income and $6,000 per month for Monica's income. Bryan was ordered to pay 34 percent of Andrew's daycare expenses, and Monica was ordered to obtain and maintain private health insurance for Andrew. The trial court determined that Monica was paying $205 per month for health insurance coverage and included that amount in the child support calculation. The court's order states that the cost of health insurance was determined by documentation attached to the order, and marked as exhibit C,

which indicates that Monica pays $205 per month for health insurance for Andrew.

The court's order also required Bryan to submit to a hair follicle drug test or a urinalysis at Monica's request and expense, no more than four times annually. The order provided that if the test results are negative for a period of 12 months, the drug testing requirement will terminate.

## ASSIGNMENTS OF ERROR

Bryan assigns that the trial court erred in (1) granting Monica a health insurance deduction without any evidence of the cost of such insurance, (2) basing Bryan's income for child support purposes on speculation, (3) failing to apply a 3-year average of Monica's income in calculating child support, and (4) requiring Bryan to submit to a hair follicle drug test.

## STANDARD OF REVIEW

[1,2] While a paternity action is one at law, the award of child support in such an action is equitable in nature. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Id*.

## ANALYSIS

*Health Insurance Deduction.*

Bryan first assigns that the trial court erred in granting Monica a health insurance deduction for child support purposes without any evidence of the cost of such insurance. Monica testified that Andrew was not covered by health insurance at the time of trial, but that she intended to seek private health insurance coverage for him. She testified that she had investigated the cost of a "catastrophic-only" policy and the cost would be approximately $250 per month. Monica did not present any evidence other than her own testimony to show what the cost of health insurance would be.

[3] The Nebraska Child Support Guidelines provide that the increased cost to the parent for health insurance for the children shall be prorated between the parents. The parent paying the premium receives a credit against his or her share of the

monthly support, provided that the parent requesting the credit submits proof of the cost of health insurance coverage for the children. See, Neb. Ct. R. § 4-215(A) (rev. 2011); *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012).

Monica failed to submit proof of the cost of health insurance for Andrew. She presented no documentation to the court at the time of trial regarding the expense of health insurance. The only evidence presented was her own testimony that insurance would cost approximately $250 per month.

The trial court, however, relied on a document that it attached to its order and concluded that Monica was paying $205 per month for health insurance. There is nothing in the record to indicate where this document came from, and it was not entered into evidence at trial. Further, there is nothing in the record to indicate that the trial court left the record open to give Monica time to present documentation regarding insurance costs. As such, there is no evidence in the record to support the figure used by the trial court.

We conclude that Monica failed to prove the cost of health insurance for Andrew and that the trial court erred in relying on a document that was not in evidence. The trial court erred in granting Monica a health insurance deduction without any evidence of the cost of such insurance. On remand, the court is directed to recalculate child support without allowing Monica a health insurance deduction for Andrew.

*Bryan's Income.*

Bryan next assigns that the trial court erred in basing his income for child support purposes on speculation. Specifically, he argues that the court erred in accepting and relying on exhibit 3, a balance sheet dated December 3, 2013, for Bryan's business, printed from the QuickBooks records Bryan provided Monica, in determining his income. He contends that the exhibit did not accurately depict his true earnings or income and that the court arbitrarily determined his income was $3,500 per month.

The admission of exhibit 3 was within the trial court's discretion. It was produced from the copy of the QuickBooks records Bryan provided to Monica prior to trial, which were

the only financial business records Bryan kept. Although the use of the balance sheet was not ideal, there were no income tax returns to rely on, because Bryan had not filed personal or business tax returns since 2008.

Further, the court did not rely solely on exhibit 3. In addition to accepting exhibit 3 into evidence, the trial court also accepted three exhibits presented by Bryan: an estimated income statement for his business for the years 2012 and 2013 (exhibit 7); monthly deposits and withdrawals from December 2011 through November 2013 for his business checking account (exhibit 8); and an estimated income statement for the building where his business is located, which building he owns (exhibit 6). The court also heard testimony from Bryan in regard to how these exhibits were prepared, the business records he kept or did not keep, and his rental properties. Although the court specifically referred to exhibit 3 in its oral pronouncement of its decision that Bryan's income was $3,500 per month, the court also stated that "based on the evidence and lack thereof because of [Bryan's] refusal to file a tax return as required by law for the past four years, he should have a total monthly income from all sources attributed to him." Therefore, the court took into consideration all the evidence presented in regard to Bryan's income and considered his income from all sources.

Bryan put himself in the position in which he now claims error. There was no clear evidence of his income because he voluntarily failed to file tax returns since 2008 and does not keep reliable or complete business records. Accordingly, the court had to piece together the evidence it had the best it could to determine Bryan's income. We do not conclude that the trial court abused its discretion in determining that Bryan's income is $3,500 per month for child support purposes.

*Monica's Income.*

Bryan also assigns that the trial court erred in failing to use a 3-year average of Monica's income for purposes of the child support calculation. Monica testified that in the last 3 years, she has had several different jobs, most of them involving sales, and her tax returns show that her income has varied in

the 3 years before trial. At the time of trial, Monica was earn-
ing $6,000 per month, which is the income amount that the
trial court used in the child support calculation. Bryan contends
that the court should have considered Monica's fluctuation in
income and should have averaged her income for 2010, 2011,
and 2012, resulting in income of $9,335 per month, rather than
$6,000 per month.

[4,5] As a general matter, parties' current earnings are to
be used in calculating child support. *Peter v. Peter*, 262 Neb.
1017, 637 N.W.2d 865 (2002). However, if there is substantial
fluctuation in income from year to year, the trial court may use
income averaging to calculate income for child support pur-
poses. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007).
The Nebraska Child Support Guidelines specifically allow for
income averaging in certain circumstances. Worksheet 1 states:
"In the event of substantial fluctuations of annual earnings of
either party during the immediate past 3 years, the income may
be averaged to determine the percent contribution of each par-
ent as shown in item 6. The calculation of the average income
shall be attached to this worksheet."

Although the trial court in the present case could have found
that a 3-year average of Monica's earnings was appropriate, it
was not required to. Worksheet 1 states that "the income *may*
be averaged" when there have been substantial fluctuations in
annual earnings.

Further, Monica's earnings during the past 3 years have
decreased each year. This court has held that a steady decline
in a parent's income is not "substantial fluctuations" in
income. In *State on behalf of Hannon v. Rosenberg*, 11 Neb.
App. 518, 654 N.W.2d 752 (2002), the father's income had
shown a steady decrease since 1997, as opposed to the "sub-
stantial fluctuations" required by Worksheet 1. The father had
received a cut in pay in 1999 that had continued for approxi-
mately 16 months, and there was no indication that his pay
would increase in the future. This court stated that "[w]hile
using income averaging to increase support is generally bene-
ficial to minor children, this method should only be used when
the facts support it." *State on behalf of Hannon v. Rosenberg*,
11 Neb. App. at 524, 654 N.W.2d at 758. We concluded that

the facts of the case did not support the use of income averaging and that the district court had erred in using the father's average income for the 3 years prior to trial in calculating child support.

We conclude that the trial court in this case did not abuse its discretion in using Monica's monthly earnings at the time of trial for child support purposes, rather than a 3-year average of her earnings.

*Random Drug Testing Requirement.*

Finally, Bryan argues that the trial court erred in requiring him to submit to random hair follicle drug testing. The requirement specifically provides as follows:

> With notice from [Monica] to [Bryan], which notice shall be sent via email, [Bryan] shall, within 24 hours of that notice being provided, submit to a hair follicle drug test or a urinalysis screen to test for drugs. In the notice, [Monica] shall dictate whether the test is to be a hair follicle test or a UA screen and will also set forth the specific facility at which [Bryan] shall have the test performed. [Monica] shall be responsible for drug testing costs. [Monica] shall be entitled to require [Bryan] to submit to drug testing no more than four times per year. If [Bryan] does not test positive for illegal drugs for one year consecutive period, the requirements of this drug testing provision shall terminate and this provision shall no longer be in effect.

This court recently addressed a similar issue in *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014). In that case, the trial court's order gave the custodial parent the discretion to withhold overnight visitation with the noncustodial parent if the noncustodial parent cohabits with someone of the opposite sex. We held that a custodial parent cannot be granted the authority to determine the visitation privileges of the noncustodial parent, because setting the time, manner, and extent of visitation is solely the duty of the court. We found that the trial court abused its discretion in allowing the custodial parent to determine whether the noncustodial parent is entitled to

overnight visits, as such provision was an unlawful delegation of the trial court's duty.

The present case is similar to *Barth v. Barth, supra*, in that the drug testing provision gives Monica, the custodial parent, the power to dictate when, where, and how the provision will be carried out. However, we determine that the *Barth* case is distinguishable from the present case because in *Barth*, the provision at issue involved visitation, which is solely the court's duty to determine. The random drug testing provision in the present case is not tied to visitation privileges. In addition, the present case is different from *Barth* in that Bryan agreed to the provision in the temporary order and was not opposed to a drug testing provision at trial. Monica testified that Bryan had agreed to the drug testing provision in the temporary order. Bryan also indicated that he agreed based on his attorney's recommendation to do so. Bryan also testified that he did not object to the drug testing provision in and of itself, but was opposed to the hair follicle method of drug testing. Bryan testified that he told Monica he would take a urinalysis. Similarly, on appeal, Bryan's assignment of error only raises issue with the court's requiring him to submit to hair follicle drug testing. In his brief, he states that "Bryan at no point in this matter had an issue with random drug testing, it was simply the method of the same." Brief for appellant at 26.

We conclude that the trial court did not abuse its discretion in requiring Bryan to submit to random drug testing at Monica's request. However, we modify the provision to provide that when Monica requests a drug test, it should be Bryan's choice whether to submit to a hair follicle drug test or a urinalysis.

## CONCLUSION

We conclude that the trial court erred in granting Monica a health insurance deduction in the child support calculation without any evidence of the cost of such insurance. We also conclude that the trial court did not err in determining the incomes of Bryan and Monica for child support purposes.

Accordingly, the matter of child support is reversed and remanded to the trial court with directions to recalculate child support without granting Monica a health insurance deduction for Andrew. Further, we determine that the trial court did not err in requiring Bryan to submit to random drug testing at Monica's request, but we modify the provision to provide that it should be Bryan's choice whether to submit to a hair follicle drug test or a urinalysis.

AFFIRMED IN PART AS MODIFIED, AND IN PART
REVERSED AND REMANDED WITH DIRECTIONS.

---

STATE OF NEBRASKA, APPELLEE, V.
JOSHUA D. ROHDE, APPELLANT.
___ N.W.2d ___

Filed May 26, 2015.    No. A-14-379.

1. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion.
2. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.
3. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
4. **Criminal Law: Courts: Appeal and Error.** When deciding appeals from criminal convictions in county court, an appellate court applies the same standards of review that it applies to decide appeals from criminal convictions in district court.
5. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
6. **Constitutional Law: Investigative Stops: Appeal and Error.** An appellate court reviews de novo the determination that the community caretaking exception to the Fourth Amendment applied.