IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

EWING V. EVANS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SUSAN EWING, APPELLEE,

V.

JOSEPH EVANS, APPELLANT.

Filed May 7, 2019.    No. A-18-083.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Reversed and remanded with directions.

Kevin Ruser and Ryan P. Sullivan, of University of Nebraska Civil Clinical Law Program, and Sidney Huss, Allison Derr, Liz Flynn, Nicholas McGrath, and James Hannon, Senior Certified Law Students.

DeAnn C. Stover for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

INTRODUCTION

Joseph Evans appeals from the order of the district court for Lancaster County, which denied his complaint for modification of child support. For the reasons that follow, we reverse and remand with directions.

BACKGROUND

Joseph and Susan Ewing are the parents of a son born in May 2013. Susan's relationship with Joseph ended in February 2014. Joseph also has an older daughter with another woman. Joseph married a third woman in February 2016, and they remained married at the time of trial in this case.

- 1 -

At some point, Susan filed a paternity action against Joseph, seeking custody of their son and child support. A copy of that complaint is not included in our record.

On January 23, 2015, prior to the resolution of Susan's complaint, Joseph suffered injuries in a motor vehicle accident while working for the Nebraska Army National Guard. Specifically, Joseph suffered a traumatic brain injury with bleeding on the brain, several facial lacerations, and loss of feeling on one side of his face. He also had a bruised chest cavity, burst compression fracture in his spine at the L2 level, and nerve damage in his hip/leg area, as well as the onset of post-traumatic stress disorder (PTSD), and he was diagnosed with an anxiety disorder.

On March 26, 2015, the district court entered an order, ruling on Susan's complaint. The court adopted the parties' joint stipulation. A copy of the stipulation has not been included in our record on appeal. The court found that Susan was the natural mother and Joseph the natural father of the parties' son, awarded legal and physical custody of the child to Susan, and ordered Joseph to pay child support in the amount of $557 per month beginning April 1, 2015. The attached child support worksheet attributed total monthly income of $2,367 to Susan and $4,400 to Joseph, and Joseph's exemptions included $519 in child support previously ordered for other children. The court also ordered Joseph to pay 50 percent of employment-related childcare expenses incurred for his child with Susan. Joseph was to provide medical insurance for the child if available, with Susan paying the first $480 per calendar year of unreimbursed expenses and the parties each paying one-half thereafter. If medical insurance was not available through Joseph's employment or if it was cheaper to insure the child through Susan's employment, the parties were to split the cost to insure their son and all unreimbursed medical expenses.

On February 26, 2016, Joseph filed a complaint for modification, seeking to modify his child support, medical expense, and childcare obligations with respect to his son with Susan.

Trial on Joseph's complaint was held before the district court on August 25, 2017. The court heard testimony from Joseph, his wife, his friend, Susan, and his daughter's mother, and received various exhibits, including the deposition testimony of Joseph's doctor and Joseph's proposed child support worksheets.

Prior to the 2015 accident, Joseph was employed by the Nebraska Army National Guard as an Active Guard Reserve soldier, specifically, he was "the automation [noncommissioned officer] for the State of Nebraska for the joint force headquarters division of recruiting and retention." He testified that it was a physically demanding job due to military requirements that he meet certain standards for physical tasks such as pushups, sit-ups, running, and lifting. Joseph was in charge of other soldiers and his job required certification "to run secure systems for the military." His annual salary as of March 26, 2015, was approximately $30,000. Joseph returned to work for a few days following his accident, but he was thereafter placed on convalescent leave, during which time he continued to receive his salary. He was officially discharged from the National Guard in March 2016. With respect to his discharge, Joseph testified that a medical board found him unfit to continue to be a soldier.

Joseph was not employed at the time of trial, testifying that he was unable to find employment due to the injuries he suffered from the 2015 accident. After his accident, Joseph had part-time employment as a pizza driver in the summer of 2015. Joseph "threw [his] back out on a particularly difficult night" while working there and was unable to work for 3 days due to pain,

after which the pizza establishment terminated his employment according to company policy. After that, Joseph tried working with the vocational rehabilitation office during the summer of 2015 to find a job that would be able to accommodate his restrictions, but he testified that "they weren't able to really find anything" for him. He indicated that he did apply for jobs recommended by the office, specifically jobs with an "IT firm that does secure banking," a telemarketing company, and a job with a public school because he "was certified for secure communications," but that "[n]o one was really willing to give [him] a shot." He also vaguely remembered applying for a job with a property management company, which was unwilling to accommodate him. Joseph did not apply for any other jobs.

Joseph testified about his current symptoms from the injuries he sustained in the accident. According to Joseph, he has chronic back and hip pain; nerve damage in his left leg, running all the way down to his foot; and some problems with hearing, tinnitus, bright lights, attention deficit, and memory, relating to the traumatic brain injury. He indicated that he experiences these symptoms "[a]ll the time." Joseph testified that his physical restrictions stemming from his injuries, provided by his doctors, were that he was not supposed to sit too long, walk too far, bend, crouch, kneel, work on a ladder, work overhead, or work bending over. He stated that if he sits or stands for an extended period, he experiences painful back spasms, which he described as "a throbbing, aching pain that starts in [his] lower back" that also runs down through his pelvic area to his leg. He indicated that he can sit or stand anywhere from 10 to 30 minutes before experiencing these pain symptoms and that he might be able to tolerate the pain for 30 minutes to an hour before he needs to take a break. He indicated that if he pushes his limits too far he "go[es] into a pain cycle," which basically immobilizes him for a "long time." We note that at one point during direct examination by his attorney, Joseph obtained permission from the district court to stand for the remainder of his questioning.

Joseph has received various treatments since the accident to address his injuries. At the time of trial, he was still doing aqua therapy, had just completed a round of physical therapy, and he continued to take various prescribed pain medications. He has received "cortical [sic] injections" in his spine, the most recent being in June prior to trial.

As a result of his traumatic brain injury, Joseph underwent speech therapy, has learned strategies to deal with memory issues, and has gone to counseling. Joseph indicated that his memory had improved a little bit since the accident, but he testified that he continued to experience weekly PTSD attacks, which could be triggered by things such as traffic sounds, and daily anxiety attacks, which might be triggered by "[h]igh intensity moments like [testifying at trial]." Joseph was still in counseling for his PTSD and anxiety, and he indicated that he planned to get tinnitus cancelling hearing aids to help him hear better. He also indicated that one of the medications he takes for back spasms helps a little with anxiety.

To address continued issues with memory and focus, Joseph writes everything down and uses a planner, but he testified that "it's a daily struggle." He indicated that the memory issues are with his short-term memory due to attention deficit, but that he is able to remember certain things better through repetition.

Joseph denied having issues with memory, anxiety, or PTSD prior to the accident, but he admitted that he previously hurt his back at one point.

Joseph testified about how he addresses his physical limitations in interacting with his children. According to Joseph, he is not as active a father as he used to be, and he is not able to do a lot of the things with his children that he would like to do. He occasionally breaks his restrictions to lift his son if necessary to address behavioral issues, but he tries not to lift him too much. If he breaks his lifting restrictions, he usually has to spend time reclining on the couch with a heating pad or "portable TENS unit," although he will usually try to "tough it through a weekend" with his children. Joseph admitted that he has participated in various activities with his children that lasted longer than 20 or 30 minutes and that he went camping the summer before trial. However, he testified that he is able to alternate between sitting and standing and sometimes uses a special chair during these activities and that while camping he slept on a "double thick air mattress." He indicated that he does experience pain while taking his children to various activities.

Joseph has received "VA disability benefits" since the time of his discharge from the National Guard, which were about $1,200 per month at the time of trial. Joseph was not receiving any Social Security benefits at the time of trial as his "initial claim" was denied. With respect to his medical expenses, Joseph testified that the military was "picking up a large portion," that his wife's insurance picked up some of it, and that he paid the rest out of his disability benefits. Joseph testified that he had "[a] lot" of outstanding medical bills at the time of trial, some of which had been turned over to collection agencies. In addition to medical expenses, Joseph contributes to the gas bill, and he pays for his car, his phone, and insurance for his son. He does not have a rent or mortgage payment or a cable bill.

At the time of trial, Joseph was attending college, "trying to educate [himself] out of the situation" presented by his injuries. He was majoring in psychology and paying for college "through vocational rehab through the VA." Joseph takes two classes per quarter, despite his physicians' advice to take only one class, and had taken about six total classes at the time of trial. He receives accommodations in the form of double the amount of time to take tests and is able to take tests at a testing center, instead of in class, and during classes he can stand up and move around as necessary. He plans to pursue a career in family or early childhood development counseling. He has spoken with various employers about accommodations for his restrictions upon graduation, which he anticipated would occur in 2018, and he has found at least one potential employer willing to accommodate him.

Joseph testified that he intends to return to work upon graduation and that he wants to support his children. He indicated that whenever he has received "a sizeable amount of money from the military," such as when he was discharged, or when he receives funds such as an income tax refund, he uses that money to pay toward his children's expenses, including back child support. Joseph testified that he was paying Susan and the mother of his daughter each $100 per month toward his obligations. At the time of trial, his child support arrearage to Susan was $5,778.16 and he owed $11,290.57 in childcare for his son; he was delinquent in child support payments owed to his daughter's mother as well.

Joseph submitted two proposed child support worksheets, calculating his support based on a total monthly income for him of $1,064.67 and for Susan of $4,359.33. He testified that the income figure he used for himself fairly and accurately represented his current income and earning ability. He testified that he used the same income for Susan as the original support order, however,

we note that the March 2015 child support order showed Susan's income as $2,367. These worksheets included deductions for child support for his older daughter in the amounts of $596 and $82, respectively, depending on whether he would be able to modify his support obligation for his daughter. He calculated his monthly support obligation in this case at $83 in the event his support obligation for his daughter is reduced, but $50 if it is not. In closing arguments at trial, Joseph's attorney referenced the fact that a modification action relating to support for his daughter had also been filed, but our record in this case does not contain any further information about the status or resolution of that case.

Joseph presented testimony from his wife and a friend that was consistent with his own testimony about his symptoms, restrictions, and activity levels since the accident.

In her testimony, Susan was asked about her observations of Joseph's physical abilities when he picked up their son. She indicated that 90 percent of the time she did not observe this interaction as Joseph would pick the child up from daycare while Susan was at work. On other occasions, her observations were limited because Joseph simply met the child at the door and they would "walk off and get in the car." She felt, however, from her observations that Joseph would be able "at least [to] hold some sort of a job." Susan testified that she had been on outings with him and their son after the accident where he had walked a considerable distance without appearing to be in pain or complaining of pain or any problems. She also testified to having observed Joseph regularly lying on the couch with a heating pad prior to the accident because "his back hurt" and he "said he had a slipped disk." According to Susan, despite this preaccident back pain, Joseph continued to work. She testified that getting child support and childcare payments from Joseph has been "an ongoing problem."

The mother of Joseph's daughter testified that she had previously seen some of the medical reports about Joseph's condition and that "from her understanding" those reports "kind of contradict[ed]" her observations of his interactions with their daughter. She also believed that Joseph "could do some type of work."

The deposition of Dr. Donald E. Burge, one of Joseph's primary care providers, was taken on August 17, 2017. Joseph has treated with both Burge and a physician's assistant in the same office since before the 2015 accident. The only time Burge saw Joseph himself following the accident was on May 1, 2017; other postaccident appointments were with the physician's assistant. Burge testified that he did not believe Joseph was able to work from the time of the 2015 accident until May 1, 2017, but he declined to opine on Joseph's status as of the time of the deposition because he was "not quite sure where things stand right at this very moment." Burge felt that as of May 1, however, Joseph's "low back pain, leg pain, paresthesias, traumatic brain injury, and [PTSD]" made it impossible for him to work at a sedentary job "[b]ecause he was in too much pain and discomfort and not being able to think clearly." He believed that Joseph's limitations as of May 1 were not permanent and that they could be "improved," which he hoped could be accomplished through further treatment.

Burge confirmed that since the accident, Joseph has received multiple forms of treatment, including physical and aquatic therapies; orthopedic, neurosurgery, and anesthesia appointments; and vocational rehabilitation. When asked whether any of this treatment had "been successful" for Joseph, Burge responded, "Not very -- well, I guess, neurophych. He's done better, so I think the

- 5 -

brain injury is probably dramatically improved, if not resolved. [PTSD] is there. He's still having back pain." Burge testified that at the time of his last appointment with Joseph on May 1, Joseph's subjective symptoms were of back pain, leg pain, burning in his foot, anxiety, and PTSD symptoms, which Burge testified were typical for individuals with Joseph's diagnoses. He indicated that Joseph's current diagnoses were low back pain, leg pain, and PTSD, but he stated that the diagnosis process was ongoing. According to Burge, Joseph's most recent appointment with the physician's assistant in Burge's office had been on August 2 for a followup with regard to his back injury. Burge testified that following that appointment, the plan was to continue in physical therapy and for further treatment by a neurosurgeon and a pain anesthesiologist, as well as continued vocational rehabilitation.

Joseph participated in a functional capacity evaluation (FCE) in April 2017. According to the report, Joseph exerted maximum effort in the testing and the results were considered valid. The FCE determined a number of physical limitations, including limitations with respect to walking, lifting and carrying, bending, standing, kneeling, climbing, and overhead work. Specifically, for work 8 hours a day, 5 days a week, the FCE reported the following limitations:

> Lifting from the floor was modified up to 18″ as [Joseph] lacks the lumbar range of motion, decreased bilateral hip strength, and reported LBP to be able to get into the full squat position.
> Able to lift up to the Light physical demand level.
> Significant limitation in walking due to gait deviation from reported lower back pain, decreased trunk control, and decreased hip strength.
> Can carry 0 - 25 lbs. on a rare basis. Unable to carry more frequently due to the walking limitation of rarely.
> Unable to assume a crouch position due to limited lumbar ROM, decreased bilateral hip strength, and report LBP.
> Limited in sitting to an occasional basis.
> Significant limitation in performing forward bending[,] standing, kneeling, stairs, and ladder due to decreased hip strength, core control, and reported LBP.
> Limitation in performing elevated work due to limited lumbar range of motion, decreased core strength, and reported LBP. Unable to perform more than occasionally due to limitation in performing standing work.
> Limitation in performing standing work on an occasional basis due to reported increasing LBP and decreasing quality of gait and posture.

During Burge's deposition, he testified that the limitations listed in the FCE report accurately reflected Joseph's limitations as of the testing date, but he stated that he did not know whether the FCE "still reflect[s] [Joseph's] current ability." He observed, however, that the last treatment note from the physician's assistant recommended that Joseph not participate in activities that exacerbate his back pain and that, consistent with the FCE, he avoid lifting, bending, standing, and walking or sitting for extended periods.

In June 2017, Joseph completed a neurological reexamination, which tested things such as cognitive functioning, processing, depression, and other factors that affect quality of life.

According to the report, Joseph asserted maximum effort in this testing and the results were considered valid. Burge was asked about this testing during his deposition, and he testified that the testing results accurately described Joseph's psychological limitations as of June 5. Burge was asked whether the psychological limitations reflected in the report could be attributed to the 2015 accident. He responded, "I would say some of 'em probably are. I can't tell you how many, but . . . it does say he has [PTSD], and that's from the accident. You know, I think he has some mild anxiety and depression symptoms which may be preceding the accident." Burge noted that during the FCE, Joseph had only been able to sit for 42 minutes but that he sat for a longer period during the neurological examination, specifically, he was able to complete the "morning long encounter with only occasional brief breaks" which made Burge feel "quite optimistic." The testing showed great improvement from his first assessment in 2015 but showed some "PTSD problems" and memory/attention deficit issues for which further counseling was recommended.

On December 29, 2017, the district court issued an order, denying Joseph's complaint. The court found that Joseph had failed to show that there had been a material change in circumstances that would warrant modification of the March 2015 order. The court stated that at the time of that order, the parties had "apparently" anticipated that Joseph's medical condition would resolve and that "in fact, the bulk of the medical evidence shows that it has except for some additional back pain, that he had, at least to some degree, prior to the car accident, and some minor PTSD issues, all subjectively reported by [Joseph]." Citing *Graber v. Graber*, 220 Neb. 816, 374 N.W.2d 8 (1985), *disapproved on other grounds, Wagner v. Wagner*, 224 Neb. 155, 396 N.W.2d 282 (1986), the court observed that temporary unemployment is not a material change of circumstances, and it denied Joseph's complaint. The court also ruled on several pending orders to show cause why Joseph should not be held in contempt for failing to pay child support and childcare expenses. In those matters, the court found the evidence showed that, at least for a period, Joseph "was experiencing a temporary loss of employment as well as some medical issues and yet still made efforts to pay something toward his child support and daycare expenses." Accordingly, the court found he had shown cause why he should not be held in contempt and vacated the pending orders to show cause.

Joseph subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Joseph asserts, reordered, that that the district court erred in (1) finding no material change in circumstances, (2) failing to calculate his monthly child support and childcare obligations based upon his current income, and (3) denying his complaint for modification of his child support and childcare obligations.

## STANDARD OF REVIEW

Modification of child support is entrusted to the discretion of the trial court. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Id.*

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id.* A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

Interpretation of the Nebraska Child Support Guidelines presents a question of law. *Hotz v. Hotz, supra*. When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions. *Id.*

ANALYSIS

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Hotz v. Hotz, supra*. A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Id.* A decree awarding child support will not be modified because of a change of circumstances which was in the contemplation of the parties at the time the original or preceding order was made, but only those anticipated changes which were specifically noted on the record at the time the previous order was entered will prevent modification. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Id.* The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Id.*

Joseph relies on Neb. Ct. R. § 4-217 (rev. 2008), which provides in part:

Application of the child support guidelines which would result in a variation by 10 percent or more, but not less than $25, upward or downward, of the current child support obligation, child care obligation, or health care obligation, due to financial circumstances which have lasted 3 months and can reasonably be expected to last for an additional 6 months, establishes a rebuttable presumption of a material change of circumstances.

A party seeking to have a prior child support order modified can prove that a modification is warranted simply by a showing of the conditions described in paragraph Q (now § 4-217) of the Nebraska Child Support Guidelines. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007).

At the time of the original child support order, the district court's child support calculation was based on Joseph's total monthly income of $4,400 and resulted in a child support obligation for Joseph of $557. At the modification trial, he offered child support calculations based on his disability compensation from the Veteran's Administration, using a total monthly income of $1,064.67, and calculating his support obligation at either $50 or $83 depending on whether his support obligation for his daughter was also modified. Clearly, either $50 or $83 represents a

decrease of more than 10 percent and a variation from his previous support greater than $25. Joseph argues the evidence at trial showed a change to his financial circumstances resulting from his disability following the 2015 accident that had lasted 3 months, that it could reasonably be expected to last for an additional 6 months, and that the change was not rebutted by the evidence offered by Susan.

We note that, although Joseph represented to the district court that his calculation used the same income for Susan as was used in the original support order, his proffered child support calculation imputed income to her of $4,740.33 (rather than the $2,367 used initially), and there is no other evidence in the record with respect to Susan's income at the time of the modification trial. Nevertheless, using Susan's income of $2,367, and Joseph's income of $1,064.67, application of the child support guidelines would most likely result in a decrease of more than 10 percent and a difference greater than $25 from Joseph's original obligation.

Joseph's reliance on § 4-217 depends upon the district court's acceptance of $1,064.67 as an accurate assessment of his current income and/or earning capacity. Joseph acknowledges that earning capacity can be used to calculate child support. Under Neb. Ct. R. § 4-204 (rev. 2016), "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." The Nebraska Supreme Court has used an obligor's earning capacity, rather than his or her actual income, when determining the applicability of § 4-217 in a proceeding for modification of child support. See *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). However, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). And, in child support cases, the court must determine the parent's current monthly income from the most reliable evidence presented. *Collins v. Collins*, 19 Neb. App. 529, 808 N.W.2d 905 (2012). Here, Joseph argues that the most reliable evidence of his earning capacity at the time of the modification trial was his current disability compensation, upon which his proposed child support calculation was based.

Joseph compares this case to *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). In that case, the father sought a modification of his child support obligation after moving from Omaha, Nebraska to Lenexa, Kansas. Subsequent to his move to Kansas, the father was laid off from his job, and he was still unemployed at the time of the modification trial. The evidence showed that the father had been looking for employment since being laid off; that he had looked in Omaha, Lenexa, and surrounding areas; that he was willing to take employment outside of his chosen field, including food services jobs; and that he had been unable to find employment. The father had received certain unemployment benefits, although he was ineligible at the time of trial, but he testified that he could reapply later. The trial court found a material change in circumstances and lowered the father's child support obligation, although not to the level desired by the father. On appeal, the Nebraska Supreme Court, agreed that the father's lack of employment was a material change in circumstances.

In this case, Joseph was injured prior to the entry of the original March 2015 support order. Nevertheless, he was apparently still employed with the National Guard at the time of the stipulation and support order. It is not clear from the record the basis for the determination of

Joseph's income at that time. During the modification trial, Joseph testified that his annual salary with the National Guard in March 2015 at the time the original order was entered was approximately $30,000. However, the child support chart showed Joseph's gross income at $4,400 per month which amounts to an annual income of $52,800. This discrepancy was not explored in the modification trial and no evidence was adduced to support an earning capacity above his previous $30,000 salary. Joseph was discharged from the National Guard based on his medical unfitness to continue as a soldier due to his injuries, and other than his brief stint as a pizza delivery driver, he has been unable to find employment since then that would accommodate his restrictions. At the time of trial, Joseph was pursuing a college degree in the hopes of establishing a career that would allow him to support his children.

In finding that there had not been a material change in circumstances, the district court in this case did not analyze whether a rebuttable presumption under § 4-217 had been established. Instead, it relied on *Graber v. Graber*, 220 Neb. 816, 374 N.W.2d 8 (1985), *disapproved on other grounds, Wagner v. Wagner*, 224 Neb. 155, 396 N.W.2d 282 (1986), for the proposition that temporary unemployment is not a material change of circumstances. In *Graber*, the mother obligated to pay child support suffered an illness that prevented her from working a few months before the modification trial. Specifically, the mother had complications following surgery and had not yet returned to work at the time of trial. She testified, however, that her disability would likely not last beyond a specific date and that she would be able to easily find work upon recovering from surgery based on her excellent qualifications. The trial court denied her application to modify her support obligation, and the Nebraska Supreme Court affirmed. Given evidence that her disability would probably last only a few months and because of her qualifications, the Supreme Court found her unemployment was temporary and not a reason to reduce her child support obligation.

Joseph's disability in this case is not necessarily temporary in the same sense as that of the mother in *Graber*. And, while the record reflects that he has made certain improvements, in particular with respect to his cognitive function, it is clear that he is still undergoing treatment for the injuries he sustained in the 2015 accident and the record does not establish a clear timeframe for when he will have reached a maximum level of recovery from his injuries. Burge opined that Joseph was unable to work from the date of the accident until May 1, 2017, the last date he was seen by Burge. Burge also opined that Joseph's limitations were not permanent and could be improved through further treatment. His testimony, however, does not establish a timeframe for this occurrence. Likewise, the record does not reveal whether Joseph's earning capacity following a more complete recovery from his injuries, and his graduation from college, will be similar to his earning capacity at the time of the original support order.

We conclude that the record here supports a finding that Joseph established a rebuttable presumption of a material change of circumstances since the entry of the initial child support order. The change in Joseph's employment and income were the result of his accident and serious injuries, for which he is still recovering. Cf. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009) (obligor parent not entitled to modification of child support where reduction in obligor's income is attributable to personal wishes and not result of unfavorable or adverse conditions in economy, obligor's health, or other circumstances affecting earning capacity). Our de novo review

of the record reveals that Susan failed to rebut the presumption established by Joseph. Susan generally focuses on Joseph's limited job search and evidence suggesting that his injuries are not permanent. However, as set forth above, Joseph worked with vocational rehabilitation services to pursue some jobs, without success, and thereafter sought further education, with assistance from the Veteran's Aministration, to improve his employment prospects, all while continuing to treat his injuries in order to be able to work within his restrictions. His medical doctor confirmed his diagnoses and limitations. No evidence was adduced by Susan to establish that Joseph had an earning capacity higher than his present income that could reasonably be realized at the time of trial or in the near future.

We find that the district court abused its discretion and erred in failing to apply the rebuttable presumption contained in § 4-217. We reverse the decision of the district court, and remand the cause with directions to find that Joseph has established a material change in circumstances warranting a modification of child support and to modify Joseph's child support retroactively to the filing of his complaint. Because the record is insufficient to determine Susan's income at the time of the modification trial and Joseph's child support obligation for his older child, the district court may hold another evidentiary hearing, at its discretion, to receive such evidence and determine the amount of Joseph's child support.

## CONCLUSION

The district court abused its discretion in failing to apply the rebuttal presumption contained in § 4-217 and in denying Joseph's application for modification of his child support obligation. We reverse the decision of the district court and remand the cause with directions as set forth above.

REVERSED AND REMANDED WITH DIRECTIONS.