IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MILLER V. MILLER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RICHARD D. MILLER, APPELLANT,

V.

CHRISTINA A. MILLER, APPELLEE.

Filed June 4, 2019.    No. A-18-368.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Andrew M. Ferguson, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellant.

John A. Kinney and Jill M. Mason, of Kinney Mason, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Richard D. Miller appeals from the decision of the Douglas County District Court concluding that no material change in circumstances occurred to warrant a change in his child support and alimony obligations, and also ordering him to pay $3,494 for Christina A. Miller's attorney fees. We affirm.

## BACKGROUND

Richard and Christina were married in 1995. Together they have four children (born 1997, 2001, 2004, and 2007). Richard filed for divorce in 2015.

### DECREE OF DISSOLUTION

The district court entered a decree dissolving Richard and Christina's marriage in June 2016. It found the parties' property settlement agreement to be fair, reasonable, and conscionable,

and approved and incorporated the agreement into the decree. The parties agreed that Richard would pay alimony to Christina in the amount of $400 per month for 60 months beginning July 1. Richard and Christina were awarded joint legal custody of their minor children; Christina received physical custody and the parties agreed upon how to allocate parenting time.

Two child support calculation worksheets were attached to the decree. One worksheet showed Richard's total monthly gross income was $8,333 and Christina's total monthly gross income was $2,000; Richard's share of monthly support for four children was $1,882. The other worksheet showed Richard's total monthly gross income was $17,567 and Christina's total monthly gross income was $1,400; Richard's share of monthly support for four children was $3,124. The decree, which reflects the parties' agreement, ordered Richard to pay child support of $2,400 per month, beginning July 1, 2016, for the parties' four minor children (reducing to $2,200 for three children, $1,800 for two children, and $1,300 for one child). Despite the child support amount ordered not matching the figures contained on either of the attached worksheets, there was no explanation in the decree as to how the ordered child support amount was determined or why the amount deviated from the attached worksheets.

POSTDECREE PROCEEDINGS

Slightly over a year after the decree was entered in June 2016, Richard filed a "Complaint for Modification of Decree" on July 12, 2017. He claimed his income decreased to the extent that the application of the Nebraska Child Support Guidelines would result in "a more than 10% decrease" in his monthly child support obligation and would result in a substantial and material change to his percent obligations for uninsured and unreimbursed medical expenses incurred for the minor children. He was "able to pay child support in an amount set by the Nebraska Child Support Guidelines, without deviation, commencing July 1." Richard alleged that he no longer had access to employer-provided medical care, causing him to "incur significant additional expense" and warranting a credit for child support. He alleged that his income decreased to the extent that alimony awarded to Christina was inequitable and unreasonable. Richard requested that the district court: (1) modify his child support obligation according to the Nebraska Child Support Guidelines; (2) order his child support guideline percentage of all uninsured and unreimbursed medical expenses incurred for the parties' minor children; (3) terminate his alimony obligation; and (4) grant him an award of attorney fees plus costs for the action.

Christina filed an "Answer and Counterclaim to Modify Decree," denying the material allegations of Richard's complaint. Christina's counterclaim alleged that the parties' earnings had changed, and resulted in an "upward variation" by 10 percent or more (but not less than $25), which had lasted at least 3 months and could reasonably be expected to last for 6 more months. She claimed an increase to Richard's child support obligation and his percentage of childcare and uninsured health care expense obligations was warranted and was in the best interests of the minor children. She requested the district court (1) modify child support pursuant to the Nebraska Child Support Guidelines, (2) adjust the above-stated expenses, and (3) award attorney's fees incurred in the action.

- 2 -

Richard testified that his current financial obligation was $2,200 per month for three children, after the oldest child "dropped off in October." He acknowledged his monthly $400 alimony obligation, estimating that he was behind in that by "at least a few months." He recalled that at the time the decree was entered, the numbers used for his income for child support calculations were somewhere between $8,000 and $12,000 a month. He denied making that much money at that time and agreed no one, including himself, knew exactly how much money he was making; he had filed an extension on his 2015 tax returns and they were not yet filed at the time the decree was entered. During cross-examination on this topic, Richard said he did not know what his income was but knew at that time from working with a colleague that "it was flowing towards that $8,000 a month" and he had anticipated that continuing. Richard agreed that he made around $140,000 in 2014. According to Richard's tax return for 2015 (exhibit 1), his adjusted gross income was $48,095.

In 2015 and 2016, Richard was self-employed but working for "Questar Capital" (Questar) in securities sales and for "American Senior Benefits" (American Senior) in insurance sales. He identified exhibit 2 as the 1099's from those companies for 2016. That exhibit reflects income from American Senior ($64,098.96), Questar Asset Management ($62,018.41) (Richard described this as "residual" and "recurring revenue" that "left with" a colleague's departure from the company in January 2017), and Questar ($31,902.01); total income of $158,019.38 in 2016. Richard agreed that his "[g]ross" earnings that year were almost $150,000 and that he did "a lot better" that year. He explained that a colleague in his office was referring him clientele because the colleague "didn't have the licenses to handle what they needed at the time" and was trying to help Richard. Near year's end, the colleague "decided to go to a different firm." Richard "also attempted to go there, but was declined to go with him." Richard claimed "most of this 2016 income left when [his colleague] left" because the colleague took his client base with him when he left Questar.

Richard continued working for the same two companies in January 2017, but was unable to generate the same type of income as he had the prior year because "the referral base stopped and the recurring revenue stopped," and in July he was informed that Questar was terminating his contract. Richard testified that Questar "randomly pull[s] credit reports on financial advisors," and Questar pulled his credit report (in 2017) and "didn't like what they saw." He received a letter from Questar in June, notifying him that Questar was terminating his association "for no cause" effective July 14 and that the same applied to Richard's association with "Questar Asset Management." Richard said he resigned July 13. A July 20 letter informed Richard that his "FINRA registration and Registered Representative Agreement with [Questar were] terminated" July 13. For securities sales work, Richard had to have securities licenses ("licenses" and "license" were used interchangeably during testimony; for consistency, we will use the plural form of the word). According to Richard, the regulating organization for financial advisors is "FINRA" and "you have to then take your license[s] and be affiliated with a firm." Richard had "Series 6" licenses for about 18 to 20 years and "Series 7" licenses for about 5 to 6 years. Although his Questar association ended, Richard still had his securities licenses but they were inactive since he

could not use them unless he was associated with a broker-dealer, like Questar. According to Richard, "You can't just work out of your basement or hang a shingle up."

Richard explained that his business had two parts, "insurance and investments . . . security sales, investment-type of products," and the majority of his income had been from Questar rather than American Senior because of his securities licenses. Exhibit 3 contains Richard's monthly bank records from January 14 to October 13, 2017, along with a cover "Deposit Summary" sheet. Although Richard had a credit union for servicing a loan, he claimed he had only this one bank account. The deposit summary sheet shows that of $62,763.81 in total deposits to this bank account for the 9-month period covered, deposits from "Income" totaled $39,323.81. Richard claimed the rest of the deposits came from family (mostly his parents) and some friends. The summary also shows that deposits from income excluding Questar totaled $28,465.10, meaning that Questar income only accounted for $10,858.71 of the total deposits, while American Senior or other "Income" totaled $28,465.10 (our review of the exhibit shows $28,263.76 in deposits from American Senior, and $201.34 in deposits from "Raiser LLC" from July 24 through October 11). Exhibit 4 (Richard's American Senior commission statement) reflects commission earnings of $29,674.95 as of September 28; Richard acknowledged that number did not exactly match what he claimed for the year as income from American Senior.

When Richard received the letter from Questar terminating his association with the company, he "probably applied for 15 jobs in the last several months" before trial. He applied for seven or eight securities-related jobs but "as soon as they saw [his] credit reports, it was pretty much over with." At the time of trial, no firm would accept him with his credit history and his chances of finding a broker-dealer were "pretty much zero until [his] situation improves."

Richard indicated that only an insurance license was required to do insurance work. However, at the time of trial, Richard was no longer working with American Senior. He testified that he was currently working for a new software company, and was also "soliciting insurance on a very part-time basis" for Bankers Life. He had "tried to apply for [his] securities license[s]" at Bankers Life; exhibit 6 includes an October 4, 2017, email from Bankers Life stating that "Bankers Life Securities" decided not to approve Richard's request for registration after a review of his application and background verification reports.

Richard testified the Bankers Life "thing wasn't working out," so he met with the software company and "came to an agreement about a week and a half, two weeks ago" (before trial) and was "in the process of starting there full time." He believed his income from the job would be "commission driven" but with a "draw of $5,000 a month to start with." There would be no benefits. Richard hoped to sell enough to make more than $60,000 per year. A written contract was "being prepared" because it was "so new."

The "CEO" of a software company that owns the new software company that just hired Richard, testified that he was "life-long friends with both" Richard and Christina. The parent company had been in operation since 2014, but the new "start-up" had just begun within the "last two months or so." The start-up company "is a behavior-based risk management company" created for the financial industry; its target audience initially would be financial professionals and firms. He had "brought on" Richard within "the last week or so" to help with sales. The CEO indicated a contract was not finalized. Richard would be "an independent-contracted employee" with "a

commission-based draw starting [at] $5,000 per month"; the CEO envisioned the company might hire Richard as an employee in the future. Payment details, including Richard's commission, were not finalized. Richard was not receiving any other benefits.

Christina testified that while married, Richard sold financial and life insurance products, would occasionally network to find his own clients, and did not rely on just one person to refer business to him. Christina was employed as a sonographer and made around "[$]23 and some change, 46, maybe" an hour and worked about 30 hours "max" per week. On whether she thought there were any opportunities to make more than the $23 an hour she currently made, Christina answered, "[w]ith my education as a sonographer, that pay scale is about there. Maybe [$]28 an hour, possibly." Exhibit 15 contains Christina's paystub from September 29, 2017, along with a cover sheet breaking down her year-to-date earnings and deductions over a 9-month period. According to her summary, her average net monthly income over that 9-month period was $1,855.04. Exhibit 16 is Christina's tax return from 2015; her gross income for that year was $5,096, but as noted earlier, a gross monthly income of $2,000 was attributed to her in one child support worksheet attached to the 2016 decree, and $1,400 per month in the other worksheet.

ORDER OF MODIFICATION, MOTION FOR NEW TRIAL, AND APPEAL

The district court entered an "Order of Modification" on January 31, 2018. The court stated that it was "[w]orth noting" that at the time of the original decree, Richard agreed to earning $8,333 per month even though his 2015 tax return only showed annual income of $48,118. The court said that Richard claimed to have made $150,000 in 2016 "although he did not present records proving the same." (We note, however, that exhibit 2 contains 1099's showing total earnings of $158,019.38 in 2016.) The district court found that Richard's bank deposits totaled $62,763 for the first 9 months of 2017. It said Richard testified that he was taking a job with a "'draw'" in the amount of $5,000. The district court noted that, for the years leading up to the stipulated decree, Richard's income "seemed to vary significantly" and that his income "continues to be the subject of significant uncertainty and variance." It found "no substantial and material change in circumstances justifying a change to child support and alimony, because [Richard] has not proved that his current income is less now than it was at the time he agreed to the $8,333 figure for his income."

Alternatively, the district court concluded that even if Richard proved his income had decreased since the time of the decree, a decrease did not justify a change to child support or alimony because Richard "admitted at trial that his own mismanagement of his finances caused him to lose his licensure for selling securities." (We note that Richard did not lose his securities licensure; rather, he was unable to find a brokerage house willing to associate with him and thus his licenses were "inactive.") The court pointed out that Richard agreed to the alimony award under the original decree and the evidence did not suggest that a change to that award was warranted. The district court ordered no change to child support or alimony, and ordered Richard to pay $3,494 in attorney fees for Christina's benefit.

Richard filed a "Motion and Notice," seeking a new trial or to alter or amend the January 31, 2018, order; the motion was denied by the district court on March 7. Richard appeals.

- 5 -

ASSIGNMENTS OF ERROR

Richard claims, consolidated and restated, that the district court erred by (1) finding no material change in circumstances justifying a change to child support and not reducing that obligation in accordance with the Nebraska Child Support Guidelines, (2) finding no good cause justifying a change in alimony, and (3) ordering him to pay Christina's attorney fees.

STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). The same standard applies to the modification of child support. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *id.*

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Armknecht v. Armknecht, supra*.

ANALYSIS

CHILD SUPPORT

Richard claims the district court erred by not modifying his child support obligation. He argues that his 2016 income does not represent his current earning capacity and that he has been unable to find employment at the same level of income he "saw" that year. Brief for appellant at 12. He asserts that his income decreased "by more than 60% after 2016," in reference to the amount of deposits from income in 2017 and evidence that his income "would remain around $5,000 [per month] due to his new position." *Id.* He also claims that at the time the divorce decree was entered, the parties did not anticipate that he would need to find employment "with substantially lower income in a field outside of selling securities." *Id.* at 13. Richard contends the district court therefore abused its discretion by finding that no material change in circumstances had occurred since the entry of the decree.

A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Id.*

Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay

support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Id.* Further, the Nebraska Child Support Guidelines state that if applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. See *Fetherkile v. Fetherkile, supra*. But, the paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Id.*

In determining that no material change in circumstances had occurred in this case, the district court pointed out that Richard agreed at the time of the decree to attribute $8,333 per month in gross income to himself even though his 2015 tax return showed only an annual income of $48,118 (this reflects only business income; Richard's total income was $51,495 when adding "Gambling Winnings" of $3,377; his adjusted gross income was $48,095). Notably, the order stated, "For the years leading up to the stipulated Decree, [Richard's] income seemed to vary significantly. [Richard's] income continues to be the subject of significant uncertainty and variance." The court thereafter concluded there was no "substantial and material change in circumstances justifying a change to child support and alimony, because [Richard] has not proved that his income is less now than it was when he agreed to the $8,333 figure for his income." This statement is true when considering that Richard's business income in 2015 was only $48,118 when he agreed to attribute to himself a monthly gross income of at least $8,333 in June 2016; his alleged 2017 "income" to date was $62,763.81, which is higher than it was when Richard agreed to the child support ordered in the decree. We acknowledge, however, that Richard testified he agreed to the higher amount in the decree because he was forecasting higher earnings in 2016, whereas currently, he is forecasting lesser earnings. Nevertheless, it is evident that the district court was persuaded that Richard's income had varied significantly in the years before the decree, and that same kind of income fluctuation merely continued; hence, no material change in circumstances.

As noted in the legal principles set forth above, one factor to be considered in determining whether a material change in circumstances has occurred is whether there has been a change in Richard's financial position, including whether the change is temporary or permanent. See *Fetherkile v. Fetherkile, supra*. Making that determination is more difficult when an individual's income has fluctuated significantly in past years because of the nature of that individual's work. In such cases, a change in financial position based on higher or lower earnings in a given year can be expected, and income averaging can be used to determine a reasonable monthly income when calculating child support. See Neb. Ct. R. ch. 4, art. 2, worksheet 1, fn.5 (rev. 2015) (in event of substantial fluctuations of annual earnings of either party during immediate past 3 years, income may be averaged). Therefore, the fact that Richard's income was less in 2017 than it was in 2016 does not necessarily constitute a material change in circumstances, since it is possible his income could increase again by the following year. In other words, the current downswing in his income could be temporary, and when averaging his income over 3-year periods, there may be minimal changes to his averaged earnings. But Richard's position at trial and his argument on appeal involves more than his claim of reduced income in 2017; he contends this his inability to associate with a brokerage house where he could sell securities has had a material impact on his ability to

earn an income comparable to his former earnings. In other words, his earning capacity has been adversely affected and there is a suggestion that it could be permanent.

The Nebraska Child Support Guidelines provide, "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." Neb. Ct. R. § 4-204 (rev. 2015). "Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." *Id.* Additionally, as noted earlier, the guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent. See Neb. Ct. R. ch. 4, art. 2, worksheet 1, fn.5 (rev. 2015). In *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007), the Nebraska Supreme Court concluded that a 3-year average tended to be the most common approach in cases where a parent's income fluctuates.

Therefore, to consider whether Richard's earning capacity has been affected, we first consider his average earnings over 3-year periods of time. The record before us only provides income information for Richard from 2014 to the time of the modification trial in October 2017. Richard testified that he earned $140,000 in 2014. His 2015 tax return shows an adjusted gross income of $48,095. The 1099's for 2016 total $158,019, and Richard supplied evidence of his net deposits for 2017, which totaled $62,763.81 (net) through the middle of October 2017. He had recently begun a job that he claimed would be paying him $5,000 per month; adding 3 months of earnings at that rate to his net deposits results in about $77,763.81 total income for 2017. Averaging Richard's income for 2014, 2015, and 2016, equals $115,371 per year ($9,614.25 per month). Averaging his income for 2015, 2016, and 2017, equals $94,626 per year ($7,885.50 per month). Therefore, based solely on income averaging in the most recent 3 years, Richard has demonstrated a reduction in income which might constitute a material change in circumstances.

However, a change in the financial position of the parent obligated to pay support is not the only consideration when determining whether there has been a material change in circumstances warranting modification; other factors to be considered include: the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. See *Fetherkile v. Fetherkile, supra*. Further, a party seeking to modify a child support order must show a material change in circumstances which was not contemplated when the decree was entered. See *id*.

Richard claims that at the time the divorce decree was entered, the parties did not anticipate that he would need to find employment "with substantially lower income in a field outside of selling securities." Brief for appellant at 13. Richard spoke of his "ongoing" financial issues: monthly expenses were higher than income, which had dropped dramatically; he sold "the house" for a loss of about $100,000 and now owed "around $111,000" as a result of the "short sale" on his home. He also had a "back tax debt to the IRS," which was about $96,000 at the time of the divorce, but was now over $100,000. He was working with the IRS on a payment plan. He had "personally" paid "the State debt" of $20,000 off during divorce proceedings. Christina's counsel questioned Richard about his credit issues:

Q. So those tax years that resulted in the tax arrearages that have impacted your credit rating, those were years when you took gross income, you put it in your bank account, and you didn't pay quarterly estimated tax payments; correct?

A. Yeah, part of my income back in those . . . "we" took some qualified distributions from IRAs and didn't pay taxes on that, as well.

Q. And wasn't that because you were living a lifestyle beyond your means?

A. That could have been part of it.

. . . .

Q. So wouldn't you agree with me, sir, that the debt issues and your credit crisis that resulted in [Questar] terminating your contract was your own fault?

A. It was part my fault.

Richard suggested that Christina was also responsible and that they owed back taxes related to tax years from when they were married.

It is evident that Richard's credit issues already existed at the time of the divorce. He was aware of the substantial tax arrearages for which he acknowledged at least partial responsibility. He agreed to take the marital home in the stipulated property settlement agreement, which states that it "is anticipated that [Richard] shall sell the house and pay any *deficiency* related to the sale and indemnify [Christina] on same." (Emphasis supplied.) Therefore, at the time of the decree, Richard was already aware of these two significant obligations, along with other debts he agreed to pay. Yet, despite Richard's awareness of his responsibility for these debts, there is nothing in the record to demonstrate that he acted in good faith to aggressively pay down those debts despite his earnings of $158,019 in 2016, and his continued earnings through Questar and American Senior into 2017.

Although the June 29, 2017, termination letter from Questar to Richard informed him in a nondescript way of an impending termination "for no cause," Richard's own testimony gave a more complete context of the reasons why he lost that job. He described how Questar did not react positively to his credit report in 2017, and he received the termination letter only "about a week later" after Questar's review. He agreed that Questar terminated his contract because of his credit problems. And part of his credit history apparently problematic in Questar's view were the "house and tax -- back taxes" and the "IRS" lien. As discussed above, these were obligations known to Richard at the time of the decree. And despite significant earnings in 2016, Richard did not present evidence of how those earnings were spent; in particular, how he used that financially favorable year to maintain a credit standing he should have known would be necessary for him to keep his securities licenses active.

Instead of producing evidence to support how his substantial 2016 income had been spent, Richard provided only his bank records covering January 14 to October 13, 2017. In reviewing those records, we note the following sampling of expenditures within that timeframe: (1) $2,940 in charges at restaurants or bars; (2) $726 in golf charges; and (3) $15,699 in cash withdrawals. All the while, Richard rarely paid for his child support and alimony obligations. DHHS Payment History Reports (exhibits 10 and 11) reflect that as of October 23, 2017, he owed $14,229.09 for child support and $3,220.50 for alimony. Evidently, at least in 2017, Richard chose to spend a

great amount of income on other things rather than paying toward debts or court-ordered obligations. The evidence supports the district court's assessment that Richard's own actions, specifically financial mismanagement, were taken in bad faith and led to his negative credit score which resulted in the loss of his job at Questar.

Therefore, regardless of whether a material change in circumstances could be established based on Richard's earning capacity being diminished by his current inability to use his securities licenses, we agree with the district court's alternative determination that even if Richard proved his income had decreased, it did not justify a modification. It is invariably concluded that a reduction in child support is not warranted when an obligor parent's financial position diminishes due to his or her own voluntary wastage or dissipation of his or her talents and assets and a reduction in child support would seriously impair the needs of the children. See *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

Voluntary wastage or dissipation of talents and assets could be imparted from evidence of Richard's mismanagement of finances as the true cause of his decrease in income since the entry of the decree. Richard concedes in his appellate brief that Christina still makes the same amount of income she made at the time the decree was entered, and at trial Christina indicated that her parents had to help her accommodate the times when Richard had not provided any support. Richard did not show evidence to refute that a reduction of child support would seriously impair the children's needs. After a de novo review of the record and considering the circumstances of this case, we conclude the district court did not abuse its discretion by declining Richard's request to modify child support.

For the sake of completeness, we note that Richard also argues that if the district court concluded that no material change had occurred and Richard should still be attributed a monthly gross income of $8,333, then "[t]he decision to impose a $2,200 per month obligation on [Richard] was an unjustified deviation [from the guidelines] and an abuse of discretion." Brief for appellant at 21. "According to the [guidelines], [Richard's] obligation ought to be set at $1,607.00." *Id*. And "[t]he court gives no justification for why it imposed an additional obligation." *Id*. We first point out that the district court in the present modification proceedings did not impose any child support obligation whatsoever; rather, it left intact the parties' agreement as set forth in their dissolution decree. Further, any basis for the deviation from the child support worksheets at the time of the decree should have been reflected in the decree. However, as previously pointed out, the decree failed to provide any explanation for the deviation at that time. Notably, the parties' original decree was prepared by one of the attorneys for the parties, and approved by the other attorney; the same attorneys represent the parties currently. The decree was submitted to the district court with a waiver of a final hearing for purposes of having the decree signed and entered by the court. Richard cannot now complain of an unexplained child support deviation in the present case when he obviously agreed to the unexplained deviation when the decree was entered. The issue is only whether a material change in circumstances has occurred since the entry of the decree warranting a change in the child support obligation agreed upon in the decree, an issue already addressed above.

Richard was ordered to pay alimony of $400 per month for 60 months. On appeal, he argues that the district court erred when it did not find good cause for a reduction or termination of that obligation when his income decreased from 2016 to 2017.

Pursuant to Neb. Rev. Stat. § 42-365 (Reissue 2016), alimony orders may be modified or revoked for good cause shown. See *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009). Good cause means a material and substantial change in circumstances and depends upon the circumstances of each case. *Metcalf v. Metcalf, supra*. Good cause is demonstrated by a material change in circumstances, but any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. *Id.* The moving party has the burden of demonstrating a material and substantial change in circumstances which would justify the modification of an alimony award. *Id.* To determine whether there has been a material and substantial change in circumstances warranting modification of a divorce decree, a trial court should compare the financial circumstances of the parties at the time of the divorce decree with their circumstances at the time the modification at issue was sought. See *id.* See, also, *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997) (material change of circumstances required to justify modifications of child support are analogous to good cause requirement necessary to modify alimony).

A consent decree is usually treated as an agreement between the parties; it is accorded greater force than ordinary judgments and ordinarily will not be modified over objection of one of the parties. See *Desjardins v. Desjardins*, 239 Neb. 878, 479 N.W.2d 451 (1992). As the district court noted, Richard agreed to the alimony award under the original decree of dissolution. Christina objects to the proposed change in alimony.

We previously concluded that while Richard's financial position has changed, it was due to his own fault by his voluntary wastage and dissipation of his talents and assets. Thus, any decrease in his income cannot be attributed to good cause. See *Pope v. Pope, supra* (petition to modify or terminate alimony will be denied if change in financial condition is due to fault or voluntary wastage or dissipation of one's talents and assets). Whether Christina's income substantially increased is not in dispute. Given the foregoing, a reduction or termination of Richard's alimony obligation was not warranted. The district court did not abuse its discretion in concluding the same.

ATTORNEY FEES

Richard asserts that the district court awarded attorney fees to Christina without considering "the results obtained, the services performed, or the length of time required to prepare and present the case." Brief for appellant at 22. He alleges that the district court made no finding that his suit was frivolously filed and did not award fees on the basis that Christina was the prevailing party. He claims that the award of attorney fees in this case "broke from the custom" of awarding those fees. *Id*.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney

fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). The Nebraska Supreme Court has recognized that an award of attorney fees is appropriate in an action for modification of a dissolution decree. See *id.* Thus, there was authority in this modification action for awarding attorney fees.

It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Garza v. Garza, supra*.

Customarily in dissolution cases, attorney fees and costs are awarded only to prevailing parties or assessed against those who file frivolous suits. *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323 (2018). In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza, supra*.

In the district court's order of modification it found:

> [Christina] has no funds with which to pay her attorney. It is clear . . . that [Richard] does not pay his alimony or child support routinely or on time until [Christina] brings a contempt action. And while the Court has addressed the contempt matters in a separate order, the Court is mindful of the history of this case in making its attorney fee award.

We find no abuse of discretion by the district court in awarding attorney fees to Christina. Richard filed the action to modify the decree barely over a year after it had been entered. Although Christina was not successful in her counterclaim against Richard, she was successful in defending Richard's attempt to reduce his child support and alimony obligations. We cannot say the district court's decision to award attorney fees to Christina was an abuse of discretion.

## CONCLUSION

We affirm the judgment of the district court.

AFFIRMED.