IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WITT V. WITT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KARI L. WITT, APPELLEE,

V.

BRAD WITT, APPELLANT.

Filed December 13, 2022.    No. A-21-370.

Appeal from the District Court for Sarpy County: MICHAEL A. SMITH, Judge. Affirmed.

Bradley E. Marsicek, of Cordell Law, L.L.P., for appellant.

Jeffrey A. Wagner and Benjamin L. Bramblett, of Wagner, Meehan & Watson, L.L.P., for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Brad Witt appeals from a decree and an order amending decree of the district court for Sarpy County dissolving his marriage to Kari L. Witt. Based on the reasons that follow, we affirm.

BACKGROUND

Brad and Kari were married in 1997 and they had two children, one of whom was a minor at the time of the divorce. Custody is not an issue on appeal. Both parties were employed throughout the marriage. At the time the parties married, Kari was employed as an apartment manager and Brad was in the U.S. Air Force. Kari obtained a real estate license in 2003 and began working as a realtor. Brad retired from the Air Force in 2002 and worked at several different jobs before obtaining a real estate license in 2012. At that point, Brad began working at the same real estate agency as Kari. Kari served as a mentor and trainer for Brad early on in his real estate career.

- 1 -

In 2013, the parties both started working at Keller Williams, a real estate brokerage firm. After working there for several years as individual agents, they formed Advantage Team P.C., a business they owned jointly and to which their commissions were paid. Kari primarily did seller's listings and Brad did the buyer's side of transactions. Brad and Kari left Keller Williams in 2018 and moved to eXp Realty, an Internet-based real estate brokerage firm.

The parties separated in January 2019. Kari filed a complaint for dissolution of marriage in February 2019. The court entered a temporary order in March, awarding the parties temporary joint legal and physical custody and ordering that no child support would be paid by either party. It also ordered that Kari would be responsible for paying the business expenses, with the parties equally sharing the profits from the sources of income known as Keller Williams, RTS Title, eXp, and the Advantage Team, with the revenues and expenses to be reconciled on a monthly basis, and the appropriate payments made to each party thereafter. The court further ordered that the parties would share all client leads for the Advantage Team and provide an accounting for the same on a monthly basis of all leads received and contacted. Finally, it ordered Kari to restore Brad's access to the Advantage Team's business software and services.

In June 2019, the court entered a supplemental temporary order after the parties raised concerns with how the temporary order was being carried out. In the order, the court clarified that with respect to the parties' income sources, each month there was to be an accounting for all funds earned and that accounting was to be shared with the attorneys for both parties. The business expenses for each month were to be accounted for and shared with the attorneys for both parties. After the gross income and business expenses were accounted for, any net profit remaining was to be split evenly between the parties. Basically, the amended temporary order required both parties to provide a monthly accounting of all funds earned and all business expenses.

Kari subsequently filed a motion to amend and review the temporary order, claiming that Brad was not sending accountings to her attorney as required by the temporary orders. The court denied Kari's motion.

In November 2019, Brad filed an application for contempt and a request for an order to show cause alleging that Kari had violated the temporary order and should be found in contempt, and that the temporary order should be modified. An order to show cause was issued in December. The contempt allegation was continued until trial and ultimately decided against Brad.

In May 2020, Brad filed a motion to compel asking for an order compelling payment of spousal support and disclosure of the financial information as required in the temporary order. Brad further filed a motion for temporary child support and attorney fees based on Kari's failure to comply with the temporary orders. Brad's motions were denied.

Similarly, in May 2020, Kari filed a motion asking the court to vacate or, in the alternative, amend the financial provisions in the temporary order. Her motion was also denied.

Trial was held in October 2020.

Brad explained how profit share was earned at Keller Williams and how he and Kari structured the Advantage Team to maximize their profit share. He testified that the amount of profit share an individual agent earned was dependent upon his or her level. A higher level agent profits off of his or her own sales as well as the sales of the agents at the levels below. Brad and Kari structured the Advantage Team with Kari at a level below Brad. They put Kari's name on all sales transactions, resulting in Kari getting paid at her level and Brad also getting paid for Kari's

sales because he was a level above her. When either of them recruited a new agent, that individual was put on the level below Kari, resulting in increased profit share for both Kari and Brad.

Brad and Kari both received ongoing revenue from Keller Williams even though they were no longer affiliated with it. They received a profit share based on the sales of the agents they recruited to work there, as well as a percentage of the local office's income. Brad testified that while the case was pending, he and Kari's individual profit share amounts were deposited into a joint bank account each month and the parties then equally divided the total amount. Brad wanted the Keller Williams profit share to continue being split in the same way. Kari also testified that Brad was receiving half of the parties' profit share from Keller Williams each month.

Brad also explained that eXp has revenue sharing, instead of profit sharing, but he and Kari set up the business the same way at eXp as they did at Keller Williams. They continued to process all sales in Kari's name, regardless of who the primary agent was as a way to maximize their revenue share. Brad testified that he was still earning revenue share from those agents in his "downline" even though the Advantage Team was no longer operating as an entity. Brad stated that while the case was pending, the parties had been equally dividing the eXp revenue share earned by both parties. Brad wanted to continue equally dividing the revenue share in the future.

Kari also testified that Brad had been receiving half of the parties' revenue share every month. A 2019 "1099 Report" from eXp was entered into evidence showing Kari and Brad's individual sales and the revenue share earned on each sale. Kari earned about $24,000 in revenue share and Brad earned $2,268.

Brad testified that in addition to receiving an equal share of the parties' profit share from Keller Williams and revenue share from eXp while the case was pending, he was receiving income from commission sales and his military retirement. His military retirement income was $1,250 per month.

The parties also received eXp stock during the marriage, which was held by Brad, Kari, and the Advantage Team. The eXp stock was either awarded for meeting benchmarks or it could be purchased at a discount with commissions. Kari was awarded more stock than Brad as a result of the structure they set up to process all sales of homes in Kari's name. At the time of trial, the Advantage Team had 1,446 shares of eXp stock, Kari had 2,295 shares, and Brad had 147 shares.

Brad and Kari were also receiving income from partial ownership in a title company called RTS Title. For the first quarter of 2019, the Advantage Team received $893.62, which was equally paid out to the parties.

Brad testified that Kari controlled the client leads he received during the marriage and after the separation. The parties relied heavily on a lead service called Realtor.com, where real estate agents pay a subscription fee to get leads in specific zip codes. The service limits the number of agents that can subscribe to client leads from a given zip code. Brad testified that he did not have access to the Realtor.com account during the marriage and did not know how much the parties paid for it each month or what area it covered. He testified that he received referrals directly from Realtor.com for a few months after the separation and he timely responded to the referrals. Kari also texted him leads "a handful of times." The leads from Realtor.com stopped coming directly to him in May or June 2019. He testified that not having the Realtor.com leads greatly impacted his ability to continue as a realtor.

Kari testified that after the temporary order was entered she had all the Realtor.com leads go to Brad. She claimed he received 154 client leads while the case was pending. Kari admitted that at some point she stopped forwarding the leads because Brad was not responding to the leads in a timely fashion and she needed the leads to try to make more money because she could not pay her bills.

Brad requested that he be awarded the Advantage Team's Realtor.com account because he helped build the business and primarily used those referrals. He testified that Kari had other client referral sources she could use. Brad had opened his own Realtor.com account a year before trial but because of the cost and the way the referral program is set up, he cannot immediately duplicate client leads similar to what the Advantage Team account generates. Other than opening his own Realtor.com account, Brad had not paid for any other lead sources. He admitted that he could grow his Realtor.com account or pay for other lead services, but chose not to because he does not have money to pay for services and does not want to go into debt. He also testified that he could not afford to pay for referral sources because Kari had not complied with the temporary order to share revenue. He had signed up for one free lead source from eXp but other than that, his lead sources came from networking and his "circle."

Brad testified that he was asking for spousal support because he helped build the Advantage Team and Kari was continuing to profit off of his contributions. He also stated that spousal support would give him extra funds for a period of time to pay for additional lead sources. Kari testified that she did not have enough money after expenses to pay Brad alimony.

In regard to the accountings required under the temporary orders, Kari testified that for the first few months after the temporary order was initially entered, she did her reconciliations on a timely basis, but Brad's income reconciliations were continually delayed. Kari had an accountant prepare the accountings at first, but she stopped because it was too expensive. She offered into evidence an accounting from January to March 2019 prepared by the accountant. The exhibit also contains a letter from Kari's attorney to Brad's attorney stating that the income could not be split between the parties as required by the temporary order until Brad provides his accounting. After 6 or 7 months, Kari delayed providing her reconciliations because she could not calculate what amount Brad was owed without his information. She admitted that from July to December 2019 she did not provide reconciliations.

Kari paid Brad $9,175 under the temporary order in 2019. Her last payment to Brad was in August 2019. She had not paid him since because she was unable to get a reconciliation from him.

Kari presented financial information which included profit and loss statements from January to December 2019; a document showing the value of her eXp stock; a document showing her profit share from Keller Williams from 2019; and a document showing the funds the Advantage Team earned for the first quarter of 2019. Those funds were equally divided between the parties. Kari also produced her tax returns from 2018 and 2019, as well as other financial documents. Another exhibit entered into evidence showed Kari's real estate listings from January to August 2020 and the commission she received from each sale.

Brad testified that he provided his monthly expenses and income as required by the temporary orders. He testified that he complied with the temporary orders by providing bank statements with different colored highlighting to indicate his income and business expenses. He stated that he provided the highlighted bank statements because he could not afford to have an

accountant do the accountings. He admitted that he did not provide the bank statements on a monthly basis. Brad also testified that he did not calculate the total income or expenses on the bank statements because he thought an accountant or "somebody" was going to reconcile the statements. The highlighted bank statements were entered into evidence.

Brad also provided exhibit 104, a purported reconciliation of income and expenses for both parties from January 2019 to August 2020. Brad testified that the purpose of the exhibit was to show some of his income that was reflected in the documentation he provided. The exhibit was also his attempt to calculate the money he was owed under the temporary order. He calculated that Kari owed him over $100,000.

Brad did not present any tax returns at trial, nor did he present all of his 1099 tax forms from his various sources of income. He admitted that there was really no way to verify what his income was based on the evidence he presented.

Following trial, the court entered a decree of dissolution awarding the parties joint legal and physical custody of the minor child and ordering Kari to pay $475 per month in child support. The court did not award either party alimony. With regard to the court's temporary orders, the court acknowledged that the "orders were difficult for the parties to perform" and that "[n]either party consistently provided adequate information to the other." The court further noted that based on the evidence provided by the parties it was difficult for the court to calculate what might still be owed from either party to the other under the temporary orders. The court, therefore, concluded that "any amounts claimed under the temporary orders entered herein are not preserved, and that neither [party] shall be in contempt for the failure to abide by those orders."

With regard to division of property, the court generally divided the marital estate and ordered Kari to pay Brad an equalization payment of $47,260.85. With regard to the parties' business assets, the court determined that eXp stock held under the Advantage Team business should be divided equally and that certain assets of Advantage Team should be awarded to Brad but that "[w]ith those exceptions, . . . there [was] no business value of the Advantage Team to be divided." The court ordered that interests in other real estate ventures should be divided equally.

Both parties filed motions to alter or amend the decree. After a hearing on the motions at which further evidence was received, the court entered an order making certain amendments to the decree, which included reducing the equalization payment Kari owed Brad to $36,551.35.

## ASSIGNMENTS OF ERROR

Brad assigns that the trial court erred in failing to (1) award him alimony, (2) enforce the temporary order and award him the portion of net income that he should have received while the case was pending, (3) award him retroactive alimony and child support, (4) include the value and debt for his vehicle and his one-half of 2019-2020 business revenues in the division of property, and (5) find Kari in contempt for failing to divide income and divide client referral leads during the pendency of the case.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Wiedel v. Wiedel*, 300

Neb. 13, 911 N.W.2d 582 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

ANALYSIS

*Alimony.*

Brad first assigns that the trial court erred in failing to award him alimony. He claims he was entitled to alimony because Kari received most of the income from the real estate business while the case was pending and she will continue to have access to their jointly acquired lead services allowing her to maintain income for herself that the parties formerly earned together.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.*

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007).

The court determined that both parties were "equally equipped to obtain an adequate income in their chosen field," and it concluded that "there [was] no equitable difference in the current or future economic circumstances of the parties which would justify an award of spousal support." We agree.

At the time the decree was entered, Kari was 51 years old and Brad was 57 years old. Both parties were employed throughout the 22-year marriage and both were licensed realtors at the time of trial, with multiple years of experience. In addition to his commissions and revenue share from selling real estate at eXp, Brad will continue to receive his military pension, as well as income from RTS Title and Keller Williams profit share.

Before Brad became a real estate agent, he was gainfully employed and there is no evidence that Kari's career ever limited any job or career opportunities available to Brad. In fact, quite the opposite is true. Her career as a real estate agent helped him get started and established in his own real estate career. Kari was supportive of his career change and was a mentor to him.

Brad argues that he should have been awarded alimony because Kari maintained the primary client lead sources that the parties jointly used to generate their joint income during the marriage. The evidence established that the parties' primary lead source was Realtor.com. After the separation Kari continued to pay for the service, which cost about $1,400 per month. Brad had opened his own account at Realtor.com, but was not willing to take on debt to grow his business

by purchasing lead services and other marketing services. Kari testified that eXp provides multiple lead-generating systems that are free of charge that a realtor can take advantage of if he or she chooses to do so. Brad testified that he was signed up for one of those systems.

Brad admitted that there was nothing prohibiting him from obtaining leads through Realtor.com or other sources besides his unwillingness to pay for them. Brad was asked what he had done to grow his business postseparation and he stated that he was networking, which he explained meant he was spending about 20 hours per week going to businesses and talking to people. He also was contacting past clients and talking to family and friends. He testified that he is not willing to spend large amounts of money to obtain leads. By his own admission, Brad is not exhausting the lead sources that are available to expand his business. Brad is not new to the real estate business, having worked in the industry for 10 years, and he has the same opportunities as Kari to obtain leads through various sources.

After reviewing the four factors a court is to consider when determining whether to award alimony, the only factor that favors alimony is the length of the marriage. We agree with the trial court that both parties were "equally equipped to obtain an adequate income" in real estate. We therefore conclude that the trial court's decision declining to award alimony was not an abuse of discretion.

*Enforcement of Temporary Order.*

Brad assigns that the trial court erred in failing to enforce the temporary orders and award him half of the parties' net income that he should have received while the case was pending. The temporary orders entered in March and June 2019 required the parties to equally share the profits from Keller Williams, RTS Title, eXp Realty, and Advantage Team. Brad argues that the court should have awarded him the funds he did not receive, but was entitled to, based on the temporary orders.

The court found there was insufficient evidence presented for it to calculate what amount, if any, was owed to Brad under the temporary orders. The court explained:

> The temporary orders of the Court were intended to provide a method to share income during the pendency of the action. However, those orders were difficult for the parties to perform. Neither party consistently provided adequate information to the other or did so on a timely basis. The Court finds it difficult, based on the evidence presented, to perform its own calculation of what may be owed under the temporary orders. It should be especially noted that there is a lack of credible evidence as to [Brad's] income during the pendency of this case. It is also apparent that the income received by both parties was less than what was required to pay their necessary living expenses and service their debt during that time period. Given the totality of the circumstances since the entry of the temporary orders, the Court finds that it would be inequitable to order the preservation of any amounts owed pursuant to the temporary orders.
>
> The Court Orders that any amounts claimed under the temporary orders entered herein are not preserved, and that neither [Kari] nor [Brad] shall be in contempt for the failure to abide by those orders.

Brad argues that like alimony and child support, the monthly net profits ordered by the temporary orders were vested at the time they were earned and immediately due and collectible on a monthly basis. He contends, therefore, that the court did not have the authority to "not preserve" Brad's interest in this income, especially since his share of income was in lieu of temporary alimony and child support.

As Brad contends, child support and alimony payments become a vested right of the payee as they accrue and a court cannot forgive or cancel past-due installments. See, *Dartmann v. Dartmann*, 14 Neb. App. 864, 717 N.W.2d 519 (2006) (child support payments become vested right of payee in dissolution action as they accrue; court may not forgive or modify past-due child support); *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002) (installments of alimony ordinarily become vested as they accrue, and past-due installments become final judgments, which courts have no authority to cancel or reduce). Brad argues that, like temporary alimony and child support, the net income he was to receive under the temporary order, was immediately due and collectible on a monthly basis and the court could not forgive it.

However, an order of temporary alimony or child support is for a court ordered, set amount each month, whereas here, the amount each month was uncertain. The parties' net income had to be calculated each month based on information from both parties. As the trial court found, neither party consistently provided adequate information to the other or did so on a timely basis. Accordingly, even if we assume without deciding that the monthly income due to Brad under the temporary orders was vested, Brad had to prove what amount, if any, he was owed each month.

Brad argues that he presented sufficient evidence at trial to show what he was owed under the temporary order. He cites to various exhibits in his brief, but primarily relies on exhibit 104, his attempt at a reconciliation of income and expenses for both parties from January 2019 to August 2020, which showed what he believed he was owed under the temporary orders. However, the exhibit was incomplete as it did not contain figures for all of Kari's income or her expenses for January to August 2020. Brad also admitted that he did not prepare the document or calculate the amounts that were on the exhibit. He also did not explain where the figures came from.

Further, as the trial court found, there was also a lack of credible evidence as to Brad's income during the pendency of the case. Brad offered his bank statements into evidence with different-colored highlights to categorize his expenses and income in an effort to establish his net income. He did not calculate the total income and/or expenses on the bank statements. He thought providing the bank statements was a sufficient accounting. However, Brad admitted that there was no way to verify his income based on the evidence he presented.

In addition, based on the testimony of Brad and Kari, Brad was receiving half of the parties' combined eXp revenue share and half of the parties' combined Keller Williams profit share while the case was pending. Accordingly, even without the monthly accountings, Brad had received some of the income he was to receive under the temporary orders.

We conclude that Brad did not present sufficient evidence at trial to establish what amount, if any, he was owed each month under the temporary orders. Brad has failed to meet his burden and therefore, the trial court did not abuse its discretion in failing to enforce the temporary orders.

*Retroactive Alimony and Child Support.*

Brad next assigns that the trial court erred in failing to award him retroactive alimony and child support. He contends that because the court did not award him the net profits he was entitled to under the temporary orders, it alternatively should have awarded him retroactive child support and alimony. Brad did not ask for retroactive child support and alimony as an alternative to enforcing the temporary orders at trial. It was not until the hearing on the motions to alter or amend that Brad suggested that if the court could not make "heads or tails" of what amount he was owed under the temporary orders, it should order retroactive alimony and child support. Neither Brad's assignment of error nor his argument allege that the court erred in failing to alter or amend the decree. He only argues that Kari has the ability to pay retroactive child support and alimony because she did not pay him what he was supposed to receive under the temporary orders, and the court had no reason not to order it when Kari failed to comply with the temporary orders.

Brad is essentially arguing that because he failed to present sufficient evidence at trial to prove how much he was owed under the temporary orders, the court should instead have awarded him retroactive child support and alimony. However, in order for the trial court to consider awarding retroactive alimony or child support, it would need to know the income and expenses of the parties during the pendency of the case in order to apply the Child Support Guidelines and/or to make an appropriate and fair alimony award. Again, Brad did not meet his burden. The record does not contain sufficient evidence to determine each party's monthly income and expenses. Accordingly, this assignment of error fails.

*Division of Property.*

Brad's fourth assignment of error is that the trial court erred in its division of property. Brad first argues that the court erred in excluding the value of his vehicle, as well as the debt owed on his vehicle, from the amended balance sheet. He asserts there was no reason given to exclude this one asset and debt.

At trial, Brad testified that his Silverado pickup had an estimated value of $39,179 and an outstanding debt of $56,489. In the initial decree, the court found that "the value of the Silverado pickup is approximately equal to the amount of debt encumbering said vehicle." However, on the balance sheet the court included the value of the vehicle as an asset to Brad, but did not allocate the debt associated with the vehicle. At the hearing on the motion to alter or amend, Brad's counsel brought up the issue of the vehicle on the balance sheet and argued it was unfair to attribute the asset to him without the debt, and that it affected the equalization payment. Counsel suggested that the equitable approach was to not include the vehicle as an asset, given that there is debt associated with it.

In the order amending the decree, the court stated, "the vehicle in the possession of [Brad] is valued roughly the same as the outstanding debt against such vehicle. Said vehicle shall remain in the possession of [Brad], who shall hold [Kari] harmless from said debt." Neither the value of the vehicle, nor the debt, was included on the amended balance sheet.

We conclude there is no abuse of discretion in regard to the court excluding the value and debt for Brad's vehicle from the amended balance sheet. The court did exactly what Brad's counsel asked for at the hearing to alter or amend in regard to his vehicle. One may not invite error and then complain of it. *State v. Craven*, 18 Neb. App. 633, 790 N.W.2d 225 (2010).

Further, Kari had a leased vehicle prior to the separation and that vehicle was subsequently turned in at the expiration of the lease. Kari then purchased a vehicle after the parties separated, which the court found was not marital property and excluded it from the property settlement. Kari testified that she had debt on the vehicle. Accordingly, the end result was that both parties were allowed to keep the vehicles in their possession with each to be responsible for the debt associated with the vehicle. This was an equitable result and Brad's argument in regard to his vehicle fails.

Brad next argues that the income he claims should have been awarded to him under the temporary orders should have been included in the property settlement. Brad is essentially making the same argument he made above—that the court erred in failing to award him what he was owed under the temporary orders. As previously discussed, this argument fails.

*Contempt.*

Finally, Brad assigns that the trial court erred in failing to find Kari in contempt for violating the temporary orders. He claims she willfully violated the temporary orders by failing to account for and divide the business income, and in failing to divide the leads generated by the business.

When a party to an action fails to comply with a court order made for the benefit of the opposing party, such act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012). "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id.* Outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence. *Id.*

As previously discussed, neither party consistently provided a monthly accounting to the other party and therefore, neither party fully complied with the temporary orders. Kari testified that she tried to reconcile all income and expenses throughout the case. She testified that when the temporary order was first entered, she did her reconciliations on a timely basis but Brad's income reconciliation was continually delayed. She also testified that for the first few months after the temporary order was entered, she had an accountant prepare the accountings for her, but she had to stop using an accountant because it was too expensive. After 6 or 7 months, she delayed providing her income reconciliation because Brad was not providing her with his information and she could not calculate what amount Brad was owed without his information.

Brad's compliance with the temporary orders consisted of providing his bank statements with different-colored highlighting to indicate his income and expenses, and he did not even provide those on a monthly basis. Both parties filed motions while the case was pending claiming that the other was not complying with the temporary orders.

We determine that any noncompliance by Kari in regard to dividing the net profits of the business was not willful. Both parties were ordered to provide their income and expenses on a monthly basis and both parties failed to do so.

In regard to Brad's allegation that Kari should have been found in contempt for failing to divide the customer leads as required in the temporary orders, Kari and Brad both testified that Brad received all the leads from Realtor.com for a few months after the temporary order was entered. Kari admitted that she later stopped forwarding the Realtor.com leads to Brad because he

was not responding to the leads in a timely fashion and she needed the leads so she could sell more houses in order to pay her bills. Brad claimed that he timely responded to the leads.

Based on the record before us, we conclude that the trial court did not err in failing to find Kari in contempt for not dividing the customer leads. Brad's final assignment of error fails.

CONCLUSION

Based on the reasons above, we conclude that Brad's assignments of error fail. Accordingly, the decree and the order amending decree are affirmed.

AFFIRMED.